

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-13-1996

# McLean v. Reno

Precedential or Non-Precedential:

Docket 95-7137

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"McLean v. Reno" (1996). *1996 Decisions.* Paper 232.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/232

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 95-7137
_____


PIC-A-STATE PA, INC.,
SCOTT McLEAN,
            Appellants

v.

JANET RENO, in her official capacity as
Attorney General of the United States of America;
THE UNITED STATES DEPARTMENT OF JUSTICE;
THE UNITED STATES OF AMERICA

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 94-cv-01490)
_____


Argued November 13, 1995

Before:  BECKER and SCIRICA, <u>Circuit</u> <u>Judges</u>
         and COHILL, <u>District</u> <u>Judge</u>*

(Filed   February 13, 1996)


        MICHAEL A. FINIO, ESQUIRE (ARGUED)
        Saul, Ewing, Remick & Saul
        240 North Third Street, Suite 700
        P.O. Box 1291
        Harrisburg, Pennsylvania 17101

        WILLIAM M. JANSSEN, ESQUIRE
        Saul, Ewing, Remick & Saul
        3800 Centre Square West
        Philadelphia, Pennsylvania 19102

        Attorneys for Appellants

*The Honorable Maurice B. Cohill, Jr., United States District Judge for the Western District of Pennsylvania, sitting by designation.

MATTHEW M. COLLETTE, ESQUIRE (ARGUED)
MARK B. STERN, ESQUIRE
United States Department of Justice
Civil Division, Appellate Staff
10th & Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Attorneys for Appellees

———————————

OPINION OF THE COURT

———————————

SCIRICA, Circuit Judge.

Pic-A-State Pa., Inc. brings a Commerce Clause challenge to the Interstate Wagering Amendment, which amended 18 U.S.C. § 1301 (1994) by prohibiting the transmission in interstate commerce of information to be used for the purpose of procuring a lottery ticket. Because the Amendment regulates an activity affecting interstate commerce and rationally relates to the goals articulated by Congress, we hold the Amendment was a constitutional exercise of Congress' power to legislate under the Commerce Clause.

I.  FACTS AND PROCEDURAL HISTORY

Congress has restricted interstate traffic in lottery tickets for over a century. See generally United States v. Edge Broadcasting Co., 113 S. Ct. 2696 (1993); see also Act of July 12, 1876, ch. 186, § 2, 19 Stat. 90; Anti-Lottery Act of 1890, ch. 908, § 1, 26 Stat. 465. Title 18 U.S.C. § 1301, the current prohibition on interstate traffic in lottery tickets, was enacted

3

by Congress in 1895.  Before amendment by the Interstate Wagering

Amendment, § 1301 provided:

> Whoever brings into the United States for the
> purpose of disposing of the same, or
> knowingly deposits with any express company
> or any common carrier for carriage, or
> carries in interstate or foreign commerce any
> paper, certificate, or instrument purporting
> to be or to represent a ticket, chance,
> share, or interest in or dependent upon the
> event of a lottery, gift enterprise, or
> similar scheme, offering prizes dependent in
> whole or part upon lot or chance, or any
> advertisement of, or list of prizes drawn or
> awarded by means of, any such lottery, gift
> enterprise, or similar scheme; or knowingly
> takes or receives any such paper,
> certificate, instrument, advertisement, or
> list so brought, deposited or transported,
> shall be fined not more than $1,000 or
> imprisoned not more than two years, or both.

Act of March 2, 1895, 28 Stat. 963; 18 U.S.C. § 1301 (1988).

Pic-A-State Pa., Inc. is a Pennsylvania corporation that was engaged in the business of taking orders for, and purchasing, out-of-state lottery tickets on behalf of customers. Pic-A-State's operations were designed to avoid the longstanding prohibition on the interstate traffic in lottery tickets by keeping the tickets themselves in the state of origin and transferring only a computer-generated "receipt" to the customer.

The Commonwealth of Pennsylvania tried repeatedly to put a stop to Pic-A-State's operations.  In 1993, the Pennsylvania legislature passed Act 8 of 1993, which prohibited the sale of any interest in another state's lottery.  72 Pa. Stat. Ann. § 3761-9(c) (1995).  Pic-A-State challenged this legislation in federal court on dormant Commerce Clause grounds,

4

and the statute was struck down by the district court. Pic-A-State Pa. v. Pennsylvania, No. 93-0814 (M.D. Pa. July 23, 1993). On appeal, we reversed citing an intervening change in federal law, the Interstate Wagering Amendment, which made the Pennsylvania statute fully consistent with federal law and not unduly burdensome on interstate commerce. Pic-A-State Pa. v. Pennsylvania, 42 F.3d 175, 178-80 (3d Cir. 1994) ("Pic-A-State I").

The Interstate Wagering Amendment amended 18 U.S.C. §1301 by providing that, in addition to § 1301's extant prohibition on the transfer in interstate commerce of any lottery ticket, any person who:

> being engaged in the business of procuring for a person in 1 State such a ticket, chance, share, or interest in a lottery, gift, enterprise or similar scheme conducted by another State (unless that business is permitted under an agreement between the States in question or appropriate authorities of those States), knowingly transmits in interstate or foreign commerce information to be used for the purpose of procuring such a chance, share or interest; . . . shall be fined not more than $1,000 or imprisoned not more than two years, or both.

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 320905, 108 Stat. 2126, 2147 (emphasis added). This Amendment was explicitly intended to prohibit Pic-A-State's line of business.

Senator Arlen Specter of Pennsylvania was the primary sponsor of the Interstate Wagering Amendment. He explained that "current law prohibit[s] interstate transfer of lottery tickets . . . . However, due to advances in communication

5

technologies, current law does not accomplish its intended goals." 139 Cong. Rec. S15247. He also noted the district court's decision in Pic-A-State Pa. v. Pennsylvania, No. 93-0814 (M.D. Pa. July 23, 1993), allowed "the sale of interests in out-of-state lottery tickets via computer transaction with no paper crossing state lines." Id. The Amendment was designed to close this "loophole." Id.

Senator Specter identified two other purposes for the Interstate Wagering Amendment. First, that the Amendment was necessary to preserve "the right of a State to regulate lottery [sic] and gambling within its borders." Id. He stated, "Federal laws should continue to limit the proliferation of interstate gambling to preserve the sovereignty of States that do not permit certain forms of gambling." Id. Second, that businesses such as Pic-A-State's would "undermine [the states'] ability to realize projected revenues." Id. Senator Joseph Biden echoed Senator Specter's concerns, noting the interstate sale of interests in lottery tickets "hurts the operation of lotteries in smaller States." Id.

Three days after the Interstate Wagering Amendment was signed into law, Pic-A-State filed this suit seeking injunctive relief and a declaratory judgment that the Amendment was unconstitutional. The district court dismissed Pic-A-State's complaint, finding no merit in any of its arguments. Pic-A-State Pa. v. Reno, No. 94-1490 (M.D. Pa. Feb. 23, 1995). Since passage of the Amendment, Pic-A-State has terminated its business.

6

We have jurisdiction to review the district court's final judgment dismissing the action under 28 U.S.C. § 1291 (1988). "Our standard of review is plenary." Juzwin v. Asbestos Corp., 900 F.2d 686, 689 (3d Cir.), cert. denied, 498 U.S. 896 (1990).

## II.  RIPENESS, STANDING AND EQUITABLE RELIEF

As an initial matter, the Government disputes whether the district court had jurisdiction to hear this case under 28 U.S.C. § 1331 (1988).  Article III, section 2 of the United States Constitution requires an actual "controversy" for a federal court to have jurisdiction.  U.S. Const. art. III, § 2. The Government argues no justiciable controversy exists because Pic-A-State has never been threatened with prosecution under amended § 1301.  It asserts the controversy is not ripe, Pic-A-State lacks standing, and Pic-A-State is not entitled to equitable relief.[0]  We will examine each of these contentions in turn.

### A.  Ripeness

In Abbott Lab. v. Gardner, 387 U.S. 136, 149 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977), and Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983), the Supreme

---

[0]  The concepts of standing and ripeness require related but distinct inquiries.  "The ripeness doctrine is often confused with the standing doctrine.  Whereas ripeness is concerned with when an action may be brought, standing focuses on who may bring a ripe action.  Although these doctrines are analytically distinct, both have evolved from Article III's case or controversy requirement."  Armstrong World Indus. v. Adams, 961 F.2d 405, 411 n.13 (3d Cir. 1992) (citations omitted).

Court held that ripeness turns on "the fitness of the issue for judicial decision" and "the hardship to the parties of withholding court consideration."  For declaratory judgments, we have refined this test because declaratory judgments are typically sought before a completed injury has occurred.  In determining whether to engage in pre-enforcement review of a statute in a declaratory judgment action, we look, among other factors, to (1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment.  Freehold Cogeneration Assocs. v. Bd. Reg. Comm'rs, 44 F.3d 1178, 1188 (3d Cir.), cert. denied, 116 S. Ct. 68 (1995); Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 647 (3d Cir. 1990).  After considering these factors, we believe this case presents a controversy ripe for resolution.

### 1.  Adversity of Interest

"For there to be an actual controversy the defendant must be so situated that the parties have adverse legal interests."  Step-Saver, 912 F.2d at 648 (quoting 10A Charles Wright, Arthur Miller & Mary Kane, Federal Practice and Procedure § 2757, at 582-83 (2d ed. 1983)).  Although Pic-A-State has not been prosecuted under the Interstate Wagering Amendment, the impact of the Amendment is sufficiently direct and immediate to create an adversity of interest between Pic-A-State and the Government.  Not only has Pic-A-State terminated its business and suffered economic loss in response to the passage of the Amendment, but any further attempt to pursue its line of business

8

would risk serious criminal penalties.[0]  "Where the legal issue presented is fit for judicial resolution, and where a regulation requires immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts . . . under the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstances."  <u>Abbott Lab. v. Gardner</u>, 387 U.S. at 153.[0]

---

[0]  At oral argument, the Government suggested that review of the Interstate Wagering Amendment was inappropriate because the federal government was unlikely to prosecute Pic-A-State.  Even if Pic-A-State were to resume its business, the Government asserted, any prosecution would be brought by the Commonwealth of Pennsylvania under Act 8 of 1993.  Although a prosecution by state authorities would raise serious prudential concerns that might call for our abstention, <u>see</u> <u>Younger v. Harris</u>, 401 U.S. 37 (1971), we need not address this eventuality now.  Furthermore, whether Pennsylvania has threatened to prosecute Pic-A-State is irrelevant to a possible federal prosecution under the amended 18 U.S.C. § 1301.

The Government's argument would also place Pic-A-State in an untenable position.  The district court found Act 8 to be unconstitutional under the dormant Commerce Clause in <u>Pic-A-State Pa. v. Commonwealth of Pennsylvania</u>, No. 93-0814 (M.D. Pa. July 23, 1993).  We reversed because the intervening passage of the Interstate Wagering Amendment made Act 8 consistent with federal law.  <u>Pic-A-State I</u>, 42 F.3d 175, 178-80 (3d Cir. 1994).  If the Interstate Wagering Amendment is unconstitutional, our decision in <u>Pic-A-State I</u> is of doubtful vitality and prosecution of Pic-A-State by Pennsylvania under Act 8 of 1993 would be suspect on dormant Commerce Clause grounds.  Thus, regardless of whether Pic-A-State is prosecuted by state or federal authorities, the central issue in this case is the constitutionality of the Interstate Wagering Amendment.  Yet the Government seeks to bar adjudication of this issue at this time.

[0]  Pic-A-State argues that under <u>Babbitt v. United Farm Workers Nat'l Union</u>, 442 U.S. 289 (1979), and <u>Steffel v. Thompson</u>, 415 U.S. 452 (1974), "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."  <u>Steffel</u>, 415 U.S. at 459.  While this statement is undoubtedly true, we note both <u>Babbitt</u> and <u>Steffel</u>

9

Moreover, courts have found sufficient adversity between parties to create a justiciable controversy when suit is brought by the only plaintiff subject to regulation by an enactment. See, e.g., Illinois v. General Elec. Co., 683 F.2d 206, 210 (7th Cir. 1982) ("as the Act has only one conceivable target . . . it is extremely unlikely that the state would overlook the violation," and the controversy is therefore ripe), cert. denied, 461 U.S. 913 (1983); Entertainment Concepts, III v. Maciejewski, 631 F.2d 497, 500 (7th Cir. 1980) (same), cert. denied, 450 U.S. 919 (1981). In introducing the Interstate Wagering Amendment, its sponsors were motivated by the desire to halt the operations of Pic-A-State specifically. See 139 Cong. Rec. S15247. Its chief sponsor mentioned the district court's decision in Pic-A-State Pa. v. Pennsylvania, No. 93-0814 (M.D. Pa. July 23, 1993), and explained the Amendment would close the "loophole" in the statute that allowed Pic-A-State to run its business. Id.

Under these circumstances, we believe the likelihood of prosecution under the Interstate Wagering Amendment is so strong that a justiciable issue is presented.[0] We also note that the

---

involved challenges to statutes that criminalized the exercise of First Amendment rights. Pic-A-State's claim does not involve these rights, and so we do not rely on Babbitt or Steffel in finding adversity between the parties.

[0] Moreover, as a policy matter, strong reasons counsel against requiring Pic-A-State to engage in illegal conduct before its challenge can be heard.

> Fear that courts may find the statute valid
> will deter many from risking violation;
> defense of criminal proceedings on
> constitutional grounds simply is not an

10

Government, although it has stated that a federal prosecution is unlikely, has not expressly disavowed an intent to prosecute. See Presbytery of the Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1463-68 (3d Cir. 1994) (failure of state to disavow intent to prosecute sufficient to create adversity between the parties); Salvation Army v. Department of Community Affairs, 919 F.2d 183, 192 (3d Cir. 1990) (no adversity where state gives "express assurance that there will be no enforcement").

## 2. Conclusiveness

We next examine whether the issue raised here is "based on a `real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical state of facts.'" Step-Saver, 912 F.2d at 649 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937)) (emphasis added).

Where the question presented is "predominantly legal," a factual record is not as important as in fact-sensitive inquiries. Compare Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. at 201 (question

---

adequate remedy. In addition to this practical fact, more abstract principles suggest that a citizen should not be required to sacrifice his wish to conform to valid social prescriptions in order to test his belief of invalidity; citizens should be allowed to prefer official adjudication to private disobedience.

13A Charles Wright, Arthur Miller & Mary Kane, Federal Practice and Procedure § 3532.5, at 183-84 (2d Ed. 1984).

11

of federal preemption is "predominantly legal" and need not await development of factual record); Abbott Lab. v. Gardner, 387 U.S. at 149 (declaratory judgment challenge to regulations presented purely legal issues fit for resolution even before prosecution instituted); with Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 294-95 (1981) ("actual factual setting" is "particularly important in cases raising allegations of an unconstitutional taking of private property."). Because Pic-A-State brings a facial challenge to the constitutionality of the Interstate Wagering Amendment, further development of the factual record by the prosecution of Pic-A-State would not inform our legal analysis. Both parties have approached this case as one presenting the purely legal question of the scope of Congress' power to legislate under the Commerce Clause. The Government has made no attempt to justify the Interstate Wagering Amendment in factual terms. Accordingly, we believe the legal issues presented may be conclusively resolved even before the prosecution of Pic-A-State.

### 3. Utility

Finally, we focus on the utility of the present resolution of this dispute. We consider "whether the parties' plans of action are likely to be affected by a declaratory judgment." Step-Saver, 912 F.2d at 649 n.9. Unlike our cases in which we have concluded that a judgment would not have a significant effect, see Armstrong World Indus. v. Adams, 961 F.2d 405, 423-24 (3d Cir. 1992); Step-Saver, 912 F.2d at 649-50, we believe resolution of this case will materially affect the

12

parties.  Pic-A-State has abandoned its line of business because of the passage of the Interstate Wagering Amendment.  Were the Amendment to be declared unconstitutional, Pic-A-State would promptly resume its activities.  Accordingly, we believe this case is ripe at this time.

### B.  Standing

The Government also attacks Pic-A-State's standing to bring this suit, asserting no harm is imminent because no prosecution is pending.  As the Supreme Court has stated, "there is no question in the present case that petitioners have sufficient standing as plaintiffs: the regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the . . . rule they are quite clearly exposed to the imposition of strong sanctions."  Abbott Lab. v. Gardner, 387 U.S. at 154.  Accordingly, we find no merit in the Government's argument.

### C.  Equitable Relief

Finally the Government asserts equitable injunctive relief is unavailable because Pic-A-State is threatened with no immediate harm.  The Government relies on Younger v. Harris, 401 U.S. 37 (1971), and the line of cases that holds federal courts should not enjoin pending state criminal prosecutions.  See, e.g., Douglas v. City of Jeannette, 319 U.S. 157, 163 (1943); Watson v. Buck, 313 U.S. 387, 400 (1941).  Here there is no state prosecution, a federal statute is at issue, and there are no grounds for federal courts to abstain from hearing the challenge.

Therefore, we will reach the merits.

13

III.  THE COMMERCE CLAUSE

The Commerce Clause of the United States Constitution provides that "Congress shall have Power . . . To regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  This power is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution."  Gibbons v. Ogden, 9 Wheat. 1, 196 (1824).  Accordingly, "[t]he task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow."  Hodel v. Virginia Surface Mining & Recl. Assn., 452 U.S. at 276.  "The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding."  Id.  This established, the only remaining question for judicial inquiry is whether the means chosen by Congress are "reasonably adapted" to the asserted goals of the legislation.  Id.; Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258 (1964).  "The judicial task is at an end once the court determines that Congress acted rationally in adopting a particular regulatory scheme."  Hodel, 452 U.S. at 276; see also United States v. Pozsgai, 999 F.2d 719, 733 (3d Cir. 1993) ("We will uphold application of the law if there is a `rational basis' for the congressional determination that the regulated activity `affects interstate commerce,' and if the means chosen to regulate the activity are reasonable."), cert. denied, 114 S. Ct. 1052 (1994); United States v. Frame, 885 F.2d

14

1119, 1126 (3d Cir. 1989) ("It is well settled that Congress will have validly exercised its power to regulate interstate commerce if the activity being regulated affects commerce, and if there is a rational connection between the regulatory means selected and the asserted ends."), cert. denied, 493 U.S. 1094 (1990).

## A. Affects Commerce

It is beyond dispute that state lotteries affect interstate commerce. In the Lottery Case, 188 U.S. 321, 354 (1903), the Supreme Court held that "lottery tickets are subjects of traffic and therefore are subjects of commerce, and the regulation of the carriage of such tickets from State to State . . . is a regulation of commerce among the several states." Although Pic-A-State does not transport actual lottery tickets across state lines, but only sells interests in lottery tickets via computer, its activities may still be regulated by Congress. The power of Congress to regulate interstate commerce extends not only to "the exchange and transportation of commodities, or visible, tangible things, but the carriage of persons and the transmission by telegraph of ideas, wishes, orders, and intelligence." Id. at 351-52. Congress' power to regulate interstate commerce also reaches the transmission of information by computer for the purpose of purchasing lottery tickets. Moreover, Pic-A-State itself notes that national lottery sales exceeded $30 billion in 1993. Brief of the Appellants at 20 n.5. A business of such enormous economic impact is a proper subject for congressional regulation under the Commerce Clause.

15

B.  Rational Basis

1.

Accordingly, the task before us is to determine whether Congress acted rationally in adopting the regulatory scheme of which the Interstate Wagering Amendment is a part.  Hodel, 452 U.S. at 276.  Pic-A-State asserts the Interstate Wagering Amendment cannot survive scrutiny under a "rational basis" review because it is not "reasonably adapted" to a legitimate end.  It makes three arguments.

First, Pic-A-State argues the historical rationale for federal regulation of lotteries was Congress' perception that lotteries were "evils" to be strictly contained, if not absolutely prohibited.  In the wake of the legalization of lotteries by over thirty states, Pic-A-State contends that regulation of lotteries as "evils" is no longer rational. Second, Pic-A-State asserts the protection of the states' ability to regulate gambling within their own borders is an impermissible purpose for federal lawmaking.  Third, it contends the Interstate Wagering Amendment will insulate state lotteries from competition, and this restraint on trade is irrational.

Pic-A-State misapprehends the nature of a "rational basis" review of legislation under the Commerce Clause.  We do not substitute our judgment for that of Congress.  "Where the legislative judgment is drawn in question," our inquiry "must be restricted to the issue of whether any state of facts either known or which could reasonably be assumed affords support for it."  United States v. Carolene Prod. Co., 304 U.S. 144, 154

16

(1938).  The Supreme Court's recent decision in <u>United States v.</u>
<u>Lopez</u>, 115 S. Ct. 1624 (1995), does not change the nature of this
inquiry.  <u>Lopez</u> asks whether the activity at issue could
rationally be understood to affect commerce.  The Court did not
reach the question of whether the legislation itself was
rationally related to its announced goal.[0]

In introducing the Interstate Wagering Amendment on the
Senate floor, its proponents advanced several justifications,
including the prevention of reductions in state lottery revenues,
the preservation of "the sovereignty of State lottery programs,"
and the enforcement of the federal laws prohibiting interstate
gambling.  <u>See</u> 139 Cong. Rec. S15247.  The Interstate Wagering
Amendment is rationally related to achieving these goals.

First, Congress could rationally determine that the
sale of interests in lottery tickets across state lines might
cause revenue shortfalls in some lottery states, particularly
smaller states.  The Chair of the Pennsylvania Council on Aging
stated in a letter to Senator Specter that the sale of out-of-
state lottery tickets would "have a direct and negative impact on
Pennsylvania lottery sales.[0]  The final result will be revenue

---

[0]  The impetus behind striking down the Gun-Free School Zones Act
under the Commerce Clause in <u>Lopez</u> was a concern for federalism.
<u>See</u> <u>United States v. Lopez</u>, 115 S. Ct. 1624, 1629 (1995).  The
Interstate Wagering Amendment supplements and guarantees, not
usurps, the states' power to regulate their own lotteries.
Despite Pic-A-State's arguments, it therefore seems an unsuitable
object for a Commerce Clause challenge under <u>Lopez</u>.
[0]  The Director of Public Relations and Special Events for the
Pennsylvania Lottery testified that "800,000 to a million
dollars" is an "extremely conservative" estimate of the losses
suffered by the Pennsylvania lottery in 1991-92 due to the
interstate sale of lottery tickets.  App. at 213a-215a.

losses for programs that assist very vulnerable older citizens of Pennsylvania."[0]  139 Cong. Rec. S15247.  The Governor of Delaware also submitted a letter complaining that such sales "have the potential to negatively affect state revenues from lottery ticket sales, especially for smaller states."  Id. at S15248.  As Senator Specter noted, "[a]ny erosion of revenues due to the sale of out-of-State lottery tickets is contrary to the purpose of State lottery programs."  Id. at S15247.  "State lottery programs are based on the premise that the revenues derived from the lottery go toward State programs for the betterment of that particular State."  Id.  Congress made a reasonable determination that the prohibition of interstate sales of lottery tickets would promote the purposes for which the various states have instituted lotteries.  We will not second-guess this judgment.

Moreover, Congress rationally believed that the Interstate Wagering Amendment served the purpose of preserving state sovereignty in the regulation of lotteries.  Senator Specter explained:

> the right of a State to regulate lottery [sic] and gambling within its borders must be preserved.  Federal gambling laws have traditionally enabled the States to regulate in-State gambling.  Federal laws should continue to limit the proliferation of interstate gambling to preserve the sovereignty of States that do not permit certain forms of gambling.

---

[0]  Proceeds from the Pennsylvania lottery are earmarked for programs that benefit senior citizens.  See 72 Pa. Stat. Ann. §3761-2 (1995).

18

Id. The Interstate Wagering Amendment furthered these goals by giving the states the sole right to regulate lottery sales within their borders. The states need not permit the sale of interests in out-of-state lottery tickets, but may do so by concluding an agreement for that purpose with other states. 18 U.S.C. § 1301. The Interstate Wagering Amendment thus allows the various states to gauge the economic effects of their own lotteries without out-of-state interference, to form their own judgments about the propriety of lotteries, and to regulate the types of state-sponsored gambling they wish to allow within their borders.

Finally, Congress could rationally conclude that the Interstate Wagering Amendment was necessary to effectuate the purposes for which 18 U.S.C. § 1301 was originally enacted. As Senator Specter stated, the federal gambling laws were clearly intended to prohibit the interstate transportation and sale of lottery tickets, but "the development of communications technology resulted in [a] loophole in the Federal lottery law" that allowed such transactions to be consummated by computer with no papers crossing state lines. 139 Cong. Rec. S15247. Both Pennsylvania Senators believed this loophole "plainly violat[ed] the spirit and intent of the Federal law" and introduced the Interstate Wagering Amendment in order to close it. Id. at S15247-48.

In the context of the one-hundred year history of §1301 and the federal regulation of lotteries, Congress could rationally conclude the need for an amendment to close a loophole created by advances in technology unforeseeable at the time the

19

statute was originally drafted.  Congress believed that since the sale of lottery tickets across state lines was illegal, the sale of interests in tickets across state lines by computer should be illegal as well.  We believe the Commerce Clause requires no more indication of rationality for us to uphold the statutory scheme adopted by Congress.[0]

## 2.

Even evaluating the rationality of the Interstate Wagering Amendment on the terms suggested by Pic-A-State, we hold it was a constitutional exercise of Congress' power to legislate under the Commerce Clause.  Pic-A-State argues that because lotteries have been legalized by the majority of states, the interstate sale of lottery tickets may no longer rationally be prohibited on moral grounds.  We disagree.  Although many states have legalized lotteries, some have not.  Congress could rationally decide to legislate in support of the policies of nonlottery states by placing the regulation of lotteries within the discretion of each state and prohibiting out-of-state interference.  See United States v. Edge Broadcasting Co., 113 S.

---

[0]  Pic-A-State notes Congress did not conduct factfinding or rely on empirical research in drafting the Interstate Wagering Amendment and argues that this undermines the Amendment's rationality.  We are unpersuaded, as several of the justifications advanced by Congress are rational on their face. Pic-A-State further argues Congress' conclusion that the Amendment would prevent revenue shortfalls in smaller states is mistaken as a factual matter.  Even were this so, we would uphold the Interstate Wagering Amendment under rational basis review. Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." FCC v. Beach Communications, 113 S. Ct. 2096, 2101 (1993)).  "Congress need not make particularized findings in order to legislate."  Perez v. United States, 402 U.S. 146, 156 (1971).

Ct. 2696, 2703 (1993) ("[T]he Government has a substantial interest in supporting the policy of nonlottery States, as well as not interfering with the policy of States that permit lotteries."); Lottery Case, 188 U.S. at 357 (Congress may "supplement[ ] the action of those States . . . which, for the protection of the public morals, prohibit the drawing of lotteries, as well as the sale or circulation of lottery tickets, within their respective limits.").  Moreover, in arguing that the Interstate Wagering Amendment is irrational because lotteries are no longer morally proscribed, Pic-A-State necessarily implies that all of 18 U.S.C. § 1301, not just the Interstate Wagering Amendment, is now irrational.  As we have noted, § 1301 has been in the United States Code since 1895 and was upheld by the Supreme Court against a Commerce Clause challenge.  Lottery Case, 188 U.S. 321 (1903).  We do not believe that circumstances have changed so substantially as to render this body of law unconstitutional.

As for Pic-A-State's argument that the Interstate Wagering Amendment is contrary to the spirit of the antitrust laws and therefore irrational, "neither the Sherman Act nor any other antitrust statute restricts the United States government in directing action in complete contradiction to antitrust policy." Hecht v. Pro-Football, Inc., 444 F.2d 931, 935 (D.C. Cir. 1971), cert. denied, 404 U.S. 1047 (1972) (citations omitted).  The interstate sale of lottery tickets affects commerce and is contrary to the policy of several states.  In these circumstances, Congress can rationally exercise its enumerated

21

powers to prohibit the passage in interstate commerce of lottery tickets or information relating to them.

## IV.   DORMANT COMMERCE CLAUSE

Pic-A-State also contends Congress did not have the power to enact the Interstate Wagering Amendment.  Under dormant Commerce Clause principles, states may not discriminate against the flow of out-of-state goods in commerce.  Pic-A-State asserts that Congress, in legislating to supplement the states' police powers, cannot give the states the power to discriminate against out-of-state goods because such discrimination is forbidden by the dormant Commerce Clause.

The Supreme Court rejected this argument in Prudential Ins. Co. v. Benjamin, 328 U.S. 408 (1946).  In Benjamin, South Carolina imposed a three percent tax on foreign insurance companies as a condition of their doing business in the State. No similar tax was imposed on South Carolina corporations.  By statute Congress had authorized state regulation and taxation of the business of insurance.  Id. at 412, 429-30.  Prudential challenged the discriminatory tax, contending Congress could not legislatively override the dormant Commerce Clause's prohibition on discriminatory state legislation.  Rejecting Prudential's argument, the Supreme Court distinguished between the Commerce Clause and the dormant Commerce Clause:

> The one limitation bounds the power of
> Congress.  The other confines only the powers
> of the states.  And the two areas are not
> coextensive.  The distinction is not always
> clearly observed, for both questions may and
> indeed at times do arise in the same case and
> in close relationship.  But to blur them and

22

> thereby equate the implied prohibition with the affirmative endowment is altogether fallacious. There is no such equivalence.

Benjamin, 328 U.S. at 423. The Supreme Court concluded the Commerce Clause places no limitations on Congress' affirmative power to legislate, other than that the regulated activity must affect commerce. Id. It is now clear that Congress may consent to state regulation that discriminates against interstate commerce. Northeast Bancorp, Inc. v. Board of Governors, 472 U.S. 159, 174 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."); Pic-A-State I, 42 F.3d 175, 179 (3d Cir. 1994). Congress had the authority to enact the Interstate Wagering Amendment in order to supplement state legislation, even though the Amendment enables states to discriminate against out-of-state lottery tickets.

## V. CONCLUSION

The Interstate Wagering Amendment regulates lotteries--an activity affecting interstate commerce. It rationally relates to Congress' goals of protecting state lottery revenues, preserving state sovereignty in the regulation of lotteries, and controlling interstate gambling. The Amendment was a constitutional exercise of Congress' power to legislate under the Commerce Clause. We will affirm.

23