**Hicks William HELTON, d/b/a B & H Video, Plaintiff,**

v.

**Daniel J. GOOD, Sheriff of Rutherford County; and Jeff Hunt, Rutherford County District Attorney, Defendants.**

No. CIV. 1:01CV288.

United States District Court,
W.D. North Carolina,
Asheville Division.

July 5, 2002.

Luther Donald Starling, Jr., Daughtry & Starling, Smithfield, NC, for plaintiff.

Mark J. Pletzke, NC Dept. of Justice, Raleigh, NC, Scott D. MacLatchie, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for defendants.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before this Court on motion of Defendant Jeff Hunt to dismiss and for summary judgment, on motion of Defendant Daniel J. Good for summary judgment, and on motion of Plaintiff Hicks William Helton to remand the case to state court. For the reasons stated below, Helton's motion to remand is denied; however, the Defendants' motions are likewise denied, and judgment will be granted for the Plaintiff.

## I. BACKGROUND

The Plaintiff initially filed this action in the General Court of Justice, Superior Court Division of Rutherford County, North Carolina, on October 30, 2000, against Good; the State of North Carolina; the North Carolina Attorney General, Michael Easely; the Secretary of the North Carolina Department of Crime Control and Public Safety, David E. Kelley; and the Secretary of the Department of Revenue, Muriel K. Offerman, alleging that certain provisions of the North Carolina General Statutes dealing with the possession and use of a defined class of "video gaming machines" violate both the North Carolina and United States Constitutions. Count Two of the complaint, which sets forth a motion for a preliminary injunction to prohibit those laws from being enforced against Plaintiff or his property, has been previously denied by the state court. See Plaintiff's Notice of Motion and Motion to Remand, filed January 28, 2002, at 3.

The North Carolina General Assembly amended those portions of North Carolina's criminal code dealing with "slot machines and other devices" in July 2000 in response to new laws enacted in South Carolina outlawing video poker. N.C. Sess. Laws 2000–151; N.C. Gen.Stat. § 14–306 (**defining "slot machines and other devices."**). Session Law 2000–151 defines "video gaming machine" in several ways. N.C. Gen.Stat. § 14–306.1(c). It includes the definition of "slot machine or device" from § 14–306(a).[1] The definition

---

1. Section 306(a) provides:

Any machine, apparatus or device is a slot machine or device within the provisions of G.S. 14–296 through 14–309, if it is one that is adapted, or may be readily converted into one that is adapted, for use in such a way that, as a result of the insertion of any piece of money or coin or other object, such machine or device is caused to operate or may be operated in such manner that the user may receive or become entitled to receive any piece of money, credit, allowance or thing of value, or any check, slug, token or memorandum, whether of value or otherwise, or which may be ex-

changed for any money, credit, allowance or any thing of value, or which may be given in trade, or the user may secure additional chances or rights to use such machine, apparatus or device; or any other machine or device designed and manufactured primarily for use in connection with gambling and which machine or device is classified by the United States as requiring a federal gaming device tax stamp under applicable provisions of the Internal Revenue Code. This definition is intended to embrace all slot machines and similar devices except slot machines in which is kept any article to be purchased by depositing

also includes a list of examples of "video gaming machines" and the general description, "[a] video game based on or involving the random or chance matching of different pictures, words, numbers, or symbols not dependent on the skill or dexterity of the player." [2] N.C. Gen.Stat. § 14–306.1(c)(8). The statute further provides that "[f]or purposes of this section, a video gaming machine includes those that are within the scope of the exclusion provided in G.S. 14–306(b)(2), but does not include those that are within the scope of the exclusion provided in G.S. 14–306(b)(1)". [3]

Under the terms of Session Law 2000–151, "[i]t shall be unlawful for any person to operate, allow to be operated, place into operation, or keep in that person's possession for the purpose of operation any video gaming machine as defined [in the section]." N.C. Gen.Stat. § 14–306.1(a). The amendment also mandates that "the owner of any video game which is regulated [by the statute] shall register the machine with the Sheriff of the county in which the machine is located ...." N.C. Gen.Stat. § 14.306.1(i). Furthermore, Session Law 2000–151 declares, "it is unlawful to warehouse any video gaming machine except in [circumstances involving manufacture of the machines in state.]." N.C. Gen.Stat. § 14–306.1(h). The term "warehouse" is not defined in relation to Session Law 2000–151. The law contains a "grandfather clause" for any machines which were (1) "[l]awfully in operation, and available for play, within this State on or before June 30, 2000," and (2) "[l]isted in this State by January 31, 2000 for *ad valorem*

---

any coin or thing of value, and for which may be had any article of merchandise which makes the same return or returns of equal value each and every time it is operated, or any machine wherein may be seen any pictures or heard any music by depositing therein any coin or thing of value, or any slot weighing machine or any machine for making stencils by the use of contrivances operated by depositing in the machine any coin or thing of value, or any lock operated by slot wherein money or thing of value is to be deposited, where such slot machines make the same return or returns of equal value each and every time the same is operated and does not at any time it is operated offer the user or operator any additional money, credit, allowance, or thing of value, or check, slug, token or memorandum, whether of value or otherwise, which may be exchanged for money, credit, allowance or thing of value or which may be given in trade or by which the user may secure additional chances or rights to use such machine, apparatus, or device, or in the playing of which the operator does not have a chance to make varying scores or tallies.

N.C. Gen.Stat. § 14–306(a).

**2.** The List reads, "(1) A video poker game or any other kind of video playing card game. (2) A video bingo game. (3) A video craps game. (4) A video keno game. (5) A video lotto game. (6) Eight liner. (8)Pot-of-gold." N.C. Gen.Stat. § 14–306.1(c)(1–7).

**3.** Section 14–306(b) provides,

The definition contained in subsection (a) of this section ... does not include coin-operated machines, video games, pinball machines, and other computer, electronic or mechanical devices that are operated and played for amusement, that involve the use of skill or dexterity to solve problems or tasks or to make varying scores or tallies and that:

(1) Do not emit, issue, display, print out, or otherwise record any receipt, paper, coupon, token, or other form of record which is capable of being redeemed, exchanged, or repurchased for cash, cash equivalent, or prizes, or award free replays; or

(2) In actual operation, limit to eight the number of accumulated credits or replays that may be played at one time and which may award free replays or paper coupons that may be exchanged for prizes or merchandise with a value not exceeding ten dollars ($10.00), but may not be exchanged or converted to money.

N.C. Gen.Stat. § 14–306(b).

taxation for the 2000–2001 tax year." N.C. Gen.Stat. § 14–306.1(b) (**entitled "Ban on New Machines"**). Operation and possession of such "old" machines, if otherwise legal, is permitted. Not only does Session Law 2000–151 impose criminal penalties for the operation, possession with the intent to operate, or warehousing of new machines, it also makes applicable another section of the North Carolina General Statutes which provides,

> All sheriffs and officers of police are hereby authorized and directed, on information made to them on oath that any ... video game machine prohibited to be used by ... [N.C. Gen.Stat. § ] 14–306.1, is in the possession or use of any person within the limits of their jurisdiction, to destroy the same by every means in their power; and they shall call to their aid all the good citizens of the county, if necessary, to effect its destruction.

N.C. Gen.Stat. § 14–298; *see also,* N.C. Gen.Stat. § 14–308–309 (**making violation of these sections a Class 1 misdemeanor on the first offense, a Class I felony for a second offense, and a Class H felony for any additional offenses, and making any violation of those sections involving 5 or more machines a class G felony**).

Plaintiff purchased 70 new machines sometime prior to the passage of Session Law 2000–151, but after January 31, 2000, brought them to Rutherford County and placed them into operation. As such, his machines were, "lawfully in operation and available for play, within the State before June 30," but not listed for *ad valorom* taxation by January 31. The parties agree that the machines Plaintiff purchased qualify as "video gaming machines" but do not fall within the grandfather clause. Both the Plaintiff and his property are in violation of N.C. Gen.Stat. § 14–306.1 and subject to prosecution or destruction, respectively.

After the original complaint was filed in state court, the State and the individual Defendants who serve on the Council of State moved for dismissal and/or summary judgment on the grounds that they were not proper parties to the action. The state court granted those motions, finding that Sheriff Good and Jeff Hunt were the proper Defendants, but denied Plaintiff's motion for a preliminary injunction as set forth in Count Two of the complaint. Thereafter, Plaintiff filed an amended complaint on September 13, 2001, naming Good and Hunt as party Defendants. On December 13, 2001, admittedly within 30 days of the date on which he was first served in this action, Hunt filed a notice of removal in which Good joined.

## II. PLAINTIFF'S MOTION TO REMAND

The Plaintiff argues that although Hunt's notice of removal was timely, Good's failure to file a notice of removal within 30 days of the date on which he was served with the original complaint waived his right to removal. *See,* 28 U.S.C. § 1446. Based on this waiver, Good cannot now consent to Hunt's removal and remand back to the state court is required. This argument raises a rather thorny issue which is still undecided in the Fourth Circuit. *See, McKinney v. Bd. of Trustees of Mayland Comty. College,* 955 F.2d 924, 926 n. 3 (4th Cir.1992) (**noting in** *dicta* **that in this situation removal is not allowed**); *but see, Freeman v. Bechtel,* 936 F.Supp. 320, 325–26 (M.D.N.C.1996) (**holding that removal is allowed in this situation and relying on** *McKinney,* **but not commenting on the** *dicta* ).

This Court is not compelled to attempt to resolve this so called "later-served defendant" issue. As the Defendants correctly observe, Plaintiff's motion to remand is untimely. Under the applica-

ble statute, "[a] motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal . . . ." 28 U.S.C. § 1447(c). A motion to remand based on the untimeliness of removal is not based on a lack of subject matter jurisdiction. *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 392, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (**"In substance, the section differentiates between removals that are defective because of lack of subject-matter jurisdiction and removals that are defective for some other reason, *e.g.*, because the removal took place after relevant time limits had expired."**). Therefore, Plaintiff's motion to remand based on § 1447(c) is denied as untimely.

### III. DEFENDANT HUNT'S MOTION TO DISMISS

#### A. Immunity

■ In addition to the substantive grounds for summary judgment raised by both Defendants and dealt with below, Hunt raises several immunity-related grounds as bases for dismissal of the complaint. These include sovereign immunity, the Eleventh Amendment to the United States Constitution, qualified immunity, and absolute prosecutorial immunity. These arguments miss the mark. At this time, Plaintiff seeks only a declaratory judgment that the statutes at issue are unconstitutional. First Amended Complaint; Fed. R. Civ. P 57. Because the case was removed to this Court based on federal question jurisdiction, the Declaratory Judgment Act applies. 28 U.S.C. § 2201. That statute provides,

[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

*Id.* As such, Hunt's argument that Plaintiff lacks standing is the only relevant basis raised for dismissal of this action.

#### B. Standing

The Declaratory Judgment Act has been consistently utilized to determine the constitutionality of criminal statutes. *See, e.g., National Rifle Ass'n of America v. Magaw*, 132 F.3d 272 (6th Cir.1997); *Minnesota Citizens Concerned for Life v. Federal Election Comm'n*, 113 F.3d 129 (8th Cir.1997); *Pic–A–State, Pa., Inc. v. Reno*, 76 F.3d 1294 (3rd Cir.1996); *Watson v. Buck*, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941). In order to establish standing—and thus subject matter jurisdiction—under the Declaratory Judgment Act, the Plaintiff must show (1) a case of actual controversy, and (2) an independent source of federal jurisdiction. 28 U.S.C. § 2201. Here, the amended complaint alleges that application of the statutes at issue would violate the United States Constitution which satisfies the second prong of this test. Complaint, ¶ 13. While in the case of an ongoing, state-court prosecution, federal courts will abstain from granting declaratory relief, nothing will prevent such action in the absence of an extant state court proceeding. *Younger v. Harris*, 401 U.S. 37, 41–44, 46, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Samuels v. Mackell*, 401 U.S. 66, 72–73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

■ When a Rule 12(b)(1) motion challenges the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider

evidence outside the pleadings without converting the proceeding to one for summary judgment. *Id.; Trentacosta v. Frontier Pacific Aircraft Indus., Inc.,* 813 F.2d 1553, 1558 (9th Cir.1987). The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Id.,* at 1559 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Id.,* at 1558; *Richmond, Fredericksburg, & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991).

 "Declaratory judgements are typically sought before a completed 'injury-in-fact' has occurred, but must be limited to the resolution of an 'actual controversy.'" *See, National Rifle Ass'n,* 132 F.3d at 279 (citing *Pic–A–State Pa.,* 76 F.3d at 1298; *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). "When seeking declaratory ... relief, a plaintiff must show actual present harm or *a significant possibility of future harm* in order to demonstrate the need for pre-enforcement review." *Id.* (citing *Bras v. California Pub. Utilities Comm'n,* 59 F.3d 869, 873 (9th Cir.1995)) (emphasis added).

> Although in regard to criminal statutes, courts are wary of compromising the public interest in efficient law enforcement by intervening prior to prosecution and foreshortening the prosecutor's action, courts have allowed pre-enforcement review of a statute with criminal penalties *when there is a great and immediate danger of irreparable loss.*

*Id.* (citing *Watson,* 313 U.S. at 400, 61 S.Ct. 962) (emphasis added). "[P]re-enforcement review is usually granted under the Declaratory Judgment Act when a statute *'imposes costly, self-executing compliance burdens ....'" Id.* (citing *Minnesota Citizens Concerned for Life,* 113 F.3d at 132) (emphasis added).

> To determine whether a plaintiff has standing to adjudicate an 'actual controversy,' requisite for relief under the Declaratory Judgment Act, one must ask whether the parties have *'adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment'* even though the injury-in-fact has not·yet been completed.

*Id.,* at 280 (citing *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Michigan State Chamber of Commerce v. Austin,* 788 F.2d 1178, 1181 (6th Cir.1986)) (emphasis added).

 Application of this standard to the instant case leads to the conclusion that Plaintiff does present an "actual controversy." A fair reading of the facts in the amended complaint and the other, undisputed facts presented in the motions and responses thereto is that Plaintiff is presently in violation of the statute by virtue of his possession of the video gaming machines within the State of North Carolina. Complaint, at 3–4; Defendant Hunt's Motion to Dismiss and for Summary Judgment, filed December 17, 2001, at 2; Defendant Good's Motion for Summary Judgment, filed December 14, 2001, at 4–5. Plaintiff has not registered the gaming machines with Good, as the Sheriff of Rutherford County. Defendant Good's Motion, at 30; Defendant Hunt's Motion, at 6. Although the facts do not indicate where the Plaintiff is storing the 70 gaming machines, if he is keeping some or all of them in one place, that would presumably qualify as "warehousing." *See,* Merriam–Webster Online Dictionary, (**defin-**

ing "warehouse" as "to deposit, store, or stock in or as if in [a structure or room for the storage of merchandise or commodities]."). Furthermore, the Plaintiff purchased the machines with the intent of operating them, he placed them into operation, and maintains the intention to operate them in the future. Complaint, at 3. As such, he is presently in violation of N.C. Gen.Stat. § 14–306.1. Furthermore, under the terms of § 14–298, he is subject to have the Sheriff enter the location where the machines are currently stored, possibly with the aid of a *posse comitatus*, and destroy the machines solely on the basis of an oath and without benefit of notice or an opportunity to be heard.[4]

The Plaintiff faces the significant possibility of future harm and has legal interests adverse to those of the officer charged with implementing the statute which are immediate and real enough to warrant the issuance of a declaratory judgment. Hunt argues that Plaintiff has not alleged that he has been threatened with imminent prosecution for his action or failure to act. Exhibit C, Affidavit of Jeff Hunt, *attached to* Defendant Hunt's Motion. Certainly, had either Defendant made an express threat of prosecution, the "actual controversy" requirement would be met. *Younger*, 401 U.S. at 42, 91 S.Ct. 746. Likewise, where the threat of prosecution is "imaginary or speculative" no such controversy exists. *Id.* Here, however, the possi-

bility of prosecution is very real, even if no threat has yet been expressly made.[5] Once the 2000 amendment to these statutes became law, Plaintiff had no choice but to remove the machines from this State to a location where they were legal or face criminal penalties and/or the destruction of his property. This qualifies as a "costly, self-executing compliance burden." Thus, the Plaintiff has established a case of actual controversy and has standing to bring this action. The Court now turns to the merits of the Plaintiff's claims.

## IV. SUMMARY JUDGMENT MOTIONS

The Defendants have moved for summary judgment, arguing that Session Law 2000–151 is constitutional on its face. The Plaintiff argues that the law violates both the equal protection and due process clauses of the Fourteenth Amendment.

Summary judgment is appropriate when there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). By reviewing substantive law, the court may determine what matters constitute material facts.

---

4. This is not to imply that Good, or any other North Carolina law enforcement officer would engage in such a practice. It is merely an observation on the terms of the statutes at issue. It appears that the practice in effectuating § 14–298 is to obtain an order from the court with jurisdiction over a pending criminal or civil matter before such destruction occurs. *State v. Campbell*, 79 N.C.App. 468, 339 S.E.2d 674 (1986).

5. It is worth noting that Hunt did not disavow the intention to enforce the provisions of Ses-

sion Law 200–151 against Plaintiff. *See* Hunt Affidavit; *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("the **State has not disavowed any intention of invoking the criminal penalty provision against [plaintiffs in a Declaratory Judgment Action]**."); *Salvation Army v. Dep't of Cmty. Affairs of State of N.J.*, 919 F.2d 183, 192 (3rd Cir.1990) ("the **current record reflects not only the absence of a threat of enforcement but an express assurance that there will be no enforcement against [plaintiff]**").

*Anderson, supra.* Here, the parties agree that no material issues remain in dispute. Nothing in the record indicates otherwise to the Court. "[This Court's] inquiry, therefore, ... extends only to the application of the law in this case." *Metropolitan Life Ins. Co. v. Pettit,* 164 F.3d 857, 860 (4th Cir.1998).

In the amended complaint and in opposition to Defendants' summary judgment motion, Plaintiff advances two different bases from which he argues that Session Law 2000–151 violates the United States Constitution and the corresponding provisions of the North Carolina Constitution.[6] Insofar as the North Carolina Constitution provides any additional protection to Plaintiff on these matters, the Court will decline to exercise its supplemental jurisdiction over these claims.[7] 28 U.S.C. § 1367(c). Plaintiff argues that because the law requires machines which were in operation on June 30, 2000, to have been registered in the *ad valorem* tax roles as of January 31, 2000, it violates both the equal protection and the due process clauses of the Fourteenth Amendment and of the State Constitution and is unconstitutional on its face. U.S. Const. amend. XIV, § 1; N.C. Const. art. I, § 19.

The parties agree that nothing about the statute discriminates against any protected class or affects any fundamental right for purposes of equal protection analysis. Defendant Hunt's Motion, at 16; Defendant Good's Motion, at 6–7; Plaintiff's Motion to Remand and Opposition to Defendants' Motions, at 8–10; *see also, Thomasson v. Perry,* 80 F.3d 915, 927 (4th Cir.1996). As such, it is only subject to "rational basis" review. *Thomasson, supra.* Because Plaintiff argues that his substantive due process rights have been violated, both claims involve the application of the same test. *See, Holland v. Keenan Trucking Co.,* 102 F.3d 736, 740 (4th Cir.1996) (**"the basic test remains the same regardless of the 'retroactive' nature of a statute: whether the statute is rationally related to a legitimate legislative purpose."**). Under this test, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Legislation that "is rationally related to a legitimate governmental interest" must be upheld. *U.S. Dep't of Agriculture v. Moreno,*

---

6. Plaintiff also argues that the law violated Article XIV, § 3 of the North Carolina Constitution. That section provides, in pertinent part:

> Whenever the General Assembly is directed or authorized by this Constitution to enact ... general laws uniformly applicable throughout the State ... no special or local act shall be enacted concerning the subject matter directed or authorized to be accomplished by general or uniformly applicable laws, and every amendment or repeal of any law relating to such subject matter shall also be general and uniform in its effect throughout the State. General laws may be enacted for classes defined by population or other criteria.

On its face, Session law 2000–151 plainly does not apply to a limited set of localities.

Rather it defines classes by "other criteria." Plaintiff's claim based on this provision is dismissed.

7. While the North Carolina Courts have declared that Article One, Section 19 of the State Constitution contains the "functionally equivalent[s]" to the Equal Protection and Due Process clauses of the 14th Amendment, they have maintained that "in the construction of the provision of the State Constitution, the meaning given by the Supreme Court of the United States to even an identical term in the Constitution of the United States is, though highly persuasive, not binding ...." *White v. Pate,* 308 N.C. 759, 765–66, 304 S.E.2d 199, 203 (1983) (citations omitted); *State v. Chisholm,* 135 N.C.App. 578, 583, 521 S.E.2d 487, 491 (1999).

413 U.S. 528, 533, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). As the Supreme Court recognized in *Romer,* "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer,* 517 U.S. at 631, 116 S.Ct. 1620 (*citing Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 271–72, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *F.S. Royster Guano Co. v. Commonwealth of Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

> [Rational basis review] "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," and those challenging the rationality of a legislative classification have the burden to negate "every conceivable basis" which might support it.

*Mitchell v. Apfel,* 19 F.Supp.2d 523, 527 (W.D.N.C.1998) (citing *Federal Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 313–16, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).

Here, the parties agree that the State was pursuing a legitimate interest, that is, the regulation of gambling. *See, e.g., State v. McCleary,* 65 N.C.App. 174, 181, 308 S.E.2d 883, 889 (1983) ("It has long been held in North Carolina that the legislature, through the exercise of its police power, may prohibit or regulate gambling."). Specifically, Session Law 2000–151 sought to discourage an influx of "video gaming machines" from South Carolina, which banned them altogether beginning July 1, 2000. Defendants argue, and two other courts have found, that "it was the purpose of the General Assembly to stop an anticipated flood of video poker machines from leaving South Carolina and being moved to North Carolina." Exhibit B, Order of Superior Court Judge Dennis J. Winner, *attached to* Defendant Good's Motion, at 2; *see also, Henderson Amusement, Inc. v. Good,* 172 F.Supp.2d 751, 754 (W.D.N.C. 2001) (**"The undisputed origin of such legislation was that lawmakers foresaw a migration in the summer of 2000 of video gaming machines from South Carolina . . . ."**).

Given that the General Assembly could legitimately regulate, or even prohibit, gambling, including video gaming machines by banning the operation of such machines altogether, the question becomes whether or not Session Law 2000–151 is rationally related to that interest. *Moreno, supra.* "The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process . . . ." *Holland,* 102 F.3d at 740 (citations omitted). Considering the fact that Session Law 2000–151 was not enacted until July 13, 2000, twelve days after the South Carolina ban went into effect, the relationship between the grandfather clause and the purported interest of the State is difficult to discern. The establishment of two dates—one on which any such machine must have been in operation within the State and the other, earlier date before which any such machine must have been listed on the tax rolls—is not rationally related to the objective of preventing the influx of such machines into North Carolina. Nor is it in reaction to or in anticipation of a complete ban on them in South Carolina, where the law establishing those two dates was enacted after the South Carolina ban went into effect and two weeks after one date and four months after the other. The Plaintiff in this case, and others similarly situated, purchased video gaming machines, brought them into North Carolina, and placed them into operation in reliance on the law as it existed during first half of 2000. N.C. Gen.Stat. § 14–295, *et seq.* (1999); *see, Landgraf v. USI Film Products,* 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (**" 'every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disabil-**

ity, in respect to transactions or considerations already past, must be deemed retrospective ....' '") (quoting *Society for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756 (C.C.D.N.H.1814) (No. 13,-156)). Those who brought the gaming machines into the State after January 31, 2000, had no duty to list them for *ad valorem* taxation until January of 2001. N.C. Gen.Stat. § 105–285. There is no rational explanation which the Defendants have presented or of which the Court can conceive to explain the inclusion of a condition with which Plaintiff and others similarly situated could not possibly have complied.

 Furthermore, parts of Session Law 2000–151 come perilously close to violating the *ex post facto* clause of the United States Constitution. U.S. Const. art. I, § 10, cl. 1. That clause provides, "[n]o State shall ... pass any ... ex post facto [l]aw ...." *Id.* "It is settled, by decisions of [the Supreme Court] so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done ... is prohibited *ex post facto.*" *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (citations omitted); *see also, Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). "[T]he central concerns of the *Ex Post Facto* Clause [are] the lack of fair notice and governmental restraint...." *Lynce v. Mathis*, 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (internal quotations omitted); *accord, Landgraf, supra.* "To fall within the *ex post facto* prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it, by altering the definition of criminal conduct...." *Id.* (internal quotations and citations omitted).

 Because it contains a prohibition on possession of video gaming machines, the undefined term "warehousing," and it provides law officers the power to destroy the video game machines without adequate process, N.C. Gen.Stat. § 14–306.1(a)(1)(a–b) fails the requirements of due process. While the ex post facto clause applies only to laws which are punitive, and thus criminal, the consequences for Plaintiff and others similarly situated who violate Session Law 2000–151 are punitive. *See, United States v. O'Neal*, 180 F.3d 115, 121 (4th Cir.1999) ("'**Punishment' and 'penalty' are constitutional terms of art, defined in contra distinction to laws that are 'civil,' ... or involve regulation of a present situation.**") (internal citations omitted). They create the immediate possibility of a fine or imprisonment because of the failure to take an action which was not required at the time it could have been performed—in Plaintiff's case, a class G felony punishable by a term of imprisonment between 8 and 36 months. N.C. Gen.Stat. § 15A–1340.17. It might be argued that the seizure provision of § 14–298 constitutes civil forfeiture, but a statute which empowers the Sheriff to round up a posse and destroy machines on sight, based solely on an oath, is punitive on its face. *See, Hudson v. United States*, 522 U.S. 93, 98–100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997); *United States v. Ursery*, 518 U.S. 267, 277, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 362–63, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984); *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). This conclusion supports the determination that § 14–306.1(a)(1)(a–b) violates the Fourteenth Amendment.

The absence of a definition for the term "warehouse," the application of § 14–298 to video game machines, and the retroac-

tive applicability of the law support the conclusion that Session Law 2000–151 is not rationally related to the governmental object of preventing an influx of video gaming machines into North Carolina in response to South Carolina's ban. As such, although there are no material issues of fact in dispute, granting judgment for the Defendants is not appropriate as a matter of law. Plaintiff has made no motion for judgment in his favor, but "[t]he grant of judgment for the nonmoving party clearly is proper if both sides agree that there are no material fact issues and join in the request that the case be decided ... on the basis of a motion for judgment made by only one of them." Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at 346. Based on the substance of the parties' motions and responses in this declaratory judgment action, such is the case here. The Defendants' motions for summary judgment are denied, and judgment in favor of the Plaintiff is granted.

## V. ORDER

IT IS, THEREFORE, ORDERED that the Plaintiff's motion to remand is hereby **DENIED;**

IT IS FURTHER ORDERED that the Defendants' motion to dismiss Plaintiff's claims based on art. XIV, § 3 of the North Carolina Constitution is **ALLOWED;**

IT IS FURTHER ORDERED that the Defendants' motions to dismiss and for summary judgment are **DENIED;** and

A Judgment for the Plaintiff is filed contemporaneously herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that

Chapter 14, Sections 298 and 306.1(a)(1)(a-b) of the North Carolina General Statutes, are hereby declared unconstitutional under the United States Constitution.

IT IS FURTHER ORDERED that Plaintiff's claim based on art. XIV, § 3 of the North Carolina Constitution is hereby **DISMISSED.**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Court declines to exercise its supplemental jurisdiction over the Plaintiff's remaining pendant state constitutional claims, and the same are hereby **DISMISSED WITHOUT PREJUDICE.**