

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2001

# NE Hub Partners LP v. CNG Transmission

Precedential or Non-Precedential:

Docket 00-3387

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"NE Hub Partners LP v. CNG Transmission" (2001). *2001 Decisions*. Paper 14.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/14

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 29, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3387

NE HUB PARTNERS, L.P.,

      Appellant

v.

CNG TRANSMISSION CORPORATION; PENN FUEL GAS,
INC.; JAMES M. SEIF; GEORGE J. MILLER; MICHELLE
A. COLEMAN; THOMAS W. RENWAND; BERNARD A.
LABUSKES, JR.

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 99-00082)
District Judge: Honorable Yvette Kane

Argued October 6, 2000

BEFORE: NYGAARD, GREENBERG, and COWEN,
Circuit Judges

(Filed: January 29, 2001)

        Walter A. Bunt, Jr. (argued)
        Daniel P. Trocchio
        Kirkpatrick & Lockhart
        535 Smithfield Street
        Henry W. Oliver Building
        Pittsburgh, PA 15222

Andrew H. Cline
Kirkpatrick & Lockhart
240 North Third Street
Harrisburg, PA 17101

 Attorneys for Appellant

Stanley R. Geary (argued)
Buchanan Ingersoll
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA 15219-1410

 Attorney for Appellee
CNG Transmission Corporation

Karol L. Newman (argued)
Hogan & Hartson
555 13th Street, N.W.
Washington, DC 02004-1109

 Attorney for Appellee
Penn Fuel Gas, Inc.

D. Michael Fisher
Attorney General
J. Bart DeLone (argued)
Deputy Attorney General
Calvin R. Koons
Senior Deputy Attorney General
John G. Knorr
Office of the Attorney General of
Pennsylvania, 15th Floor
Strawberry Square
Harrisburg, PA 17120

 Attorney for Appellees
George J. Miller, Michelle Coleman,
Thomas W. Renwand, and
Bernard A Labuskes, Jr.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

After detailed examination of numerous technical, safety, and environmental issues, the Federal Energy Regulatory Commission ("FERC") issued a certificate of public convenience and necessity for plaintiff-appellant NE Hub Partners, L.P.'s ("NE Hub") natural gas storage facility (the "Facility") in Tioga County, Pennsylvania. The Commonwealth of Pennsylvania may seek to revisit those issues in consolidated administrative appeals in its own permitting process in a costly proceeding that will delay NE Hub's construction of the Facility. Consequently, NE Hub brought a district court action seeking an injunction against the state appellate proceedings in an attempt to bar aspects of them on federal preemption grounds. The district court, however, rejected the claim without reaching its merits, principally on the jurisdictional ground that it was not ripe for decision before the state process concluded. See NE Hub Partners, L.P., No. 1: CA-99-0082 (M.D. Pa. Apr. 7, 2000) ("NE Hub"). We disagree with the district court on the ripeness issue and accordingly will reverse its order dismissing the action and will remand the case for further proceedings.

I. BACKGROUND

A. Factual History[1]

Since 1995 NE Hub has been seeking a plethora of federal and state permits to construct the Facility. The construction is a substantial undertaking requiring NE Hub to drill through the Oriskany sand formation which contains competing storage facilities owned by Penn Fuel Gas, Inc. ("Penn Fuel") and CNG Transmission Corp. ("CNGT").[2] Not surprisingly Penn Fuel and CNGT have

_____

1. We take the facts we recite mainly from the complaint which, for purposes of this appeal, should be taken as true and afforded all favorable inferences. See Standard of Review, Part III, infra.
2. CNGT now is called Dominion Transmission, Inc. and Penn Fuel now is called PPL Gas Utilities Corporation. As a matter of convenience we nevertheless continue to refer to them as CNGT and Penn Fuel.

opposed NE Hub every step of the way before both FERC and the Pennsylvania agencies exercising jurisdiction over the construction.

Because the Facility will store natural gas for use in interstate commerce it is subject to FERC's jurisdiction and thus its construction requires a certificate of public convenience and necessity (the "Certificate") pursuant to section 7(c) of the Natural Gas Act, 15 U.S.C. SS 717 et seq. ("NGA"). NE Hub applied for the Certificate in November 1995, but Penn Fuel and CNGT intervened and r equested FERC to reject NE Hub's application on a variety of technical, safety and environmental grounds, including a claim that the construction and use of the Facility threatened to damage their own facilities.

FERC reviewed the entire range of technical, safety, and environmental issues relating to the Facility, and, at the instance of Penn Fuel and CNGT, convened a technical conference on the application in September 1996 at which they raised the following 23 issues relating to the technical, safety, and environmental soundness of the Facility:

> (1)  Whether NE Hub's Drilling and Construction Program, utilizing a large diameter drill bit, would result in massive mud loss to the Oriskany sand formation;
>
> (2)  Whether circulation materials would s atisfactorily mitigate the mud loss into the surrounding geological strata;
>
> (3)  Whether test drilling perfor med on well TW-501 indicated that the Drilling and Construction Program would lead to massive fluid loss to the Oriskany sand formation;
>
> (4)  Whether NE Hub's Drilling and Construction Program had sufficient documentation r elating to rates of penetration that could reasonably be expected from the use of large diameter (28") drilling bits to penetrate the Oriskany sand formation;
>
> (5)  Whether NE Hub's Drilling and Construction Program had properly taken into account fracture permeability of the Oriskany sand formation;

4

(6)  Whether NE Hub's Drilling and Construction Program had accounted for the pressur e fluctuations it might encounter during drilling operations due to existing gas storage facilities;

(7)  Whether NE Hub's Drilling and Construction Program would result in cement invasion to the Oriskany sand formation;

(8)  Whether mud loss and cement invasion cause d by NE Hub's Drilling and Construction Program would result in irremediable damage to the deliverability of gas from the CNGT/Penn Fuel Storage;

(9)  Whether NE Hub's Drilling and Construction Program would lead to increased risk of gas leaks and catastrophic blowouts;

(10) Whether the use of large quantities of loss circulation materials in NE Hub's Drilling and Construction Program would cause a `cake' to form across the Oriskany sand for mation and reduce the likelihood of achieving an adequate cement bond between the wall of the well and the casing string;

(11) Whether NE Hub's Drilling and Construction Program would achieve the turbulent flow required to remove loss circulation material from the Oriskany sand formation and permit the development of an adequate cement bond;

(12) Whether NE Hub's Drilling and Construction Program required or contained sufficient contingencies in the event an adequate cement bond was not achieved;

(13) Whether NE Hub's Drilling and Construction Program included procedures for the use of a cement bond log tool to evaluate the integrity of the cement bond between the well and casing string;

(14) Whether NE Hub's Drilling and Construction Program would lead to fracturing of the casing shoe;

5

(15) Whether NE Hub's Drilling and Construction Program would lead to overpressuring of shallow formations;

(16) Whether NE Hub's Drilling and Construction Program would increase the likelihood of gas loss or gas migration for the CNGT/Penn Fuel Storage;

(17) Whether NE Hub's Drilling and Construction Program would result in salt caver n subsidence;

(18) Whether NE Hub's Drilling and Construction Program relied on proper resear ch and data regarding the tensile and compressive strengths for salt;

(19) Whether NE Hub's Drilling and Construction Program relied on proper mechanical integrity testing of the salt caverns;

(20) Whether NE Hub had failed to consider alter nate sites for cavern development;

(21) Whether the Sandia National Laboratories r eport used in development of the Drilling and Construction Program adequately addressed cavern operating pressures, caver n creep and subsidence, and rock mechanics;

(22) Whether the geologic conditions at locations targeted by NE Hub's Drilling and Construction Program were adequate for cavern development; and

(23) Whether NE Hub should be requir ed to obtain insurance and/or indemnities that would be available to compensate CNGT and/or Penn Fuel for potential losses arising from the construction or operation of the Facility.

App. at 20-22.

For the next year and a half FERC, in consultation with NE Hub, Penn Fuel, and CNGT and with the assistance of an outside consulting firm, exhaustively r eviewed NE Hub's proposal for the Facility, taking Penn Fuel's and CNGT's

6

objections into account. In connection with this r view NE Hub, Penn Fuel, and CNGT led what NE Hub has characterized as "a parade of experts and technical consultants before F.E.R.C." See app. at 24. FERC also made an Environmental Impact Assessment of the Facility pursuant to the National Environmental Policy Act, treating at least seven issues:

(1) Requirements for NE Hub to create more than the two salt caverns approved by the Certificate;

(2) Locations of structures and facilities necessary for the Facility, including right-of-ways and the freshwater intake structure;

(3) Whether the Facility could be constructed and operated with insignificant effects on bodies of water, including rivers and streams;

(4) Whether NE Hub's erosion and sedimentation plans were sufficient to minimize impacts on soil and bodies of water;

(5) Whether NE Hub's air pollution control plans were sufficient to minimize air quality impacts, including impacts from fugitive dust;

(6) Whether NE Hub's water quality management and N.P.D.E.S. stormwater discharge plans were sufficient to minimize impacts on water quality; and

(7) Whether NE Hub's land use and reclamation plans were adequate.

See app. at 23. We call these seven issues along with the 23 issues enumerated above the "30 Issues". In addition, FERC considered competitive and market issues.

On April 20, 1998, FERC issued the Certificate in a 93-page order. See app. at 39 et seq. The order stated that FERC had exercised its jurisdiction over the Facility and found that it could be constructed and operated safely. See app. at 24. The order, however, imposed various conditions on the construction and operation of the Facility, and stated that "NE Hub must comply with the State of Pennsylvania's drilling regulations," app. at 101, and that

7

"[r]egulation of underground storage safety is at the state level." App. at 66. It also stated:

> Any state or local permits issued with r espect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities[3] by this Commission.4

App. at 109.

Even before FERC issued its order NE Hub had applied to the Pennsylvania Department of Environmental Protection ("Pa.D.E.P.") for the r equisite state permits and thus it was proceeding on parallel regulatory paths. See app. at 25. While Pa.D.E.P. had monitor ed the FERC proceedings, it chose not to seek to intervene in them as it could have under 15 U.S.C. S 717n(a) and 18 C.F.R. S 385.214(a)(2). See app. at 25. Penn Fuel and CNGT raised each of the 30 Issues in repeated appearances before Pa.D.E.P. but nevertheless on July 17, 1997, Pa.D.E.P. issued the permits NE Hub sought. See app. at 25-26.

Over the next year Penn Fuel and CNGT filed thr ee appeals protesting issuance of the state per mits with the Environmental Hearing Board for the Commonwealth of Pennsylvania ("E.H.B."), which is authorized to hear such appeals. All the individual defendant-appellees r emaining in this action, i.e., all defendants except Penn Fuel and CNGT, are administrative law judges on the E.H.B., to whom we will refer collectively as E.H.B. In the appeals to E.H.B., which have since been consolidated, see app. at 26, Penn

_____

3. Presumably "authorized" or a wor d of similar meaning should appear here.

4. The district court interpreted this language to mean that the Certificate "was conditioned on NE Hub's obtaining any and all necessary state or local permits requir ed to carry out the drilling and construction program." See NE Hub, slip op. at 5. The parties agree that this interpretation is correct.

8

Fuel and CNGT again raised each issue they had advanced before FERC, including the 30 Issues, and pr esented testimony and documentation they had presented to FERC. See app. at 27. E.H.B. has not decided the appeals but the Pa.D.E.P. permits are valid pending its decision. See app. at 1021.

B. Procedural History

On January 15, 1999, NE Hub filed a complaint in the district court against Penn Fuel, CNGT, E.H.B. and James M. Seif, the Secretary of Pa.D.E.P., asking for a declaratory judgment that the NGA preempted the Pa.D.E.P . and E.H.B. review process. NE Hub also requested an order enjoining the E.H.B. proceedings and "such other r elief as this Court deems just and proper." See app. at 32. However, NE Hub in the district court and in this court pared the scope of its requested relief down to the 30 Issues, and renounced any claim that the Certificate completely bars state r egulation of the Facility in areas outside the 30 Issues. 5 The complaint also sought a declaratory judgment and injunctive r elief barring Penn Fuel and CNGT from relitigating the 30 Issues before Pa.D.E.P. and E.H.B. because in NE Hub's view this relitigation would amount to an appeal of the FERC order, which they could prosecute only pursuant to 15 U.S.C. S 717r(a). See app. at 32-33.

Secretary Seif settled with NE Hub on June 30, 1999, stipulating that Pa.D.E.P. lacked authority to regulate the Facility with respect to the 30 Issues, and thus the district court dismissed him as a party on July 2, 1999. See NE Hub, slip op. at 9; app. at 842-59. All other defendants, i.e.,

_____

5. See, e.g., NE Hub's Resp. in Opp'n to CNG Transmission Corp.'s Mot. to Dismiss at app. at 490 ("[T]he Complaint does not seek a declaration that NE Hub is not required to comply to any extent with state environmental or safety requirements.. . . NE Hub instead seeks a declaration that state authorities may not r egulate or adjudicate the technical, safety or environmental issues that have already been decided by the federal agency with jurisdiction over such issues." (Emphasis added.)); NE Hub's Br. in Opp'n to the E.H.B. Defendants' Mot. to Dismiss at app. at 748; id. at 750-51; NE Hub's Br. in Opp'n to James M. Seif 's Mot. to Dismiss at app. at 731; id. at 734; NE Hub Appellant's Br. at 20 n.7.

the appellees here, moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) on a variety of grounds, including ripeness, the Eleventh Amendment, abstention, and the Anti-Injunction Act. The parties agreed to stay the E.H.B. proceedings pending the outcome of this case. See NE Hub, slip op. at 8.

The district court, in a Memorandum and Order dated April 7, 2000, granted the appellees' motions and dismissed NE Hub's complaint without prejudice. See id. at 21. The court parsed NE Hub's claim against E.H.B. into two theories of preemption: one claiming preemption only insofar as the state process conflicted with the Certificate, the other claiming a right to be completely free from any state regulation. The court dismissed the action with respect to the conflict theory for lack of ripeness because E.H.B. had not yet taken an action that could interfere with the federal regulations and the court believed that the requirement that NE Hub go through the state review process was not in itself a cognizable harm in the conflict preemption context. See id. at 15–18. The court dismissed the action with respect to the total exemption from regulation theory on the grounds that NE Hub's contentions challenged the terms of the Certificate requiring the obtaining of state permits and thus should have been presented to FERC for rehearing under 15 U.S.C. S 717r(a), which precludes judicial review of FERC orders prior to rehearing by FERC. See NE Hub, slip op. at 18–19. The court then found that its jurisdiction with respect to NE Hub's claims against Penn Fuel and CNGT depended on its jurisdiction over the claims against E.H.B., and, as the latter was lacking, so was the former. See id. at 19–20. Accordingly, it dismissed the action in its entirety.

NE Hub then timely filed this appeal contending that the district court erred in dismissing its preemption claim for lack of ripeness. See NE Hub's Br. at 3. NE Hub further contends that it is not challenging FERC's order and thus it argues that the district court erred in holding that this action is barred because it has not sought rehearing of the FERC order.

10

## II. JURISDICTION

We have jurisdiction over this appeal of afinal judgment of the district court pursuant to 28 U.S.C. S 1291.6 The district court had federal question jurisdiction under 28 U.S.C. SS 1331 and 1337, because the case ar ose under the Supremacy Clause in Article VI of the United States Constitution, and the NGA.

## III. STANDARD OF REVIEW

Our review of a dismissal for lack of ripeness is plenary. See Philadelphia Fed'n of Teachers v. Ridge, 150 F.3d 319, 321 (3d Cir. 1998); see also Gould Elecs. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). Mor eover, when, as here, defendants move to dismiss a complaint under Rule 12(b)(1) for failure to allege subject matter jurisdiction we treat the allegations of the complaint as true and afford the plaintiff the favorable inferences to be drawn from the complaint.7 See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977); see also Fed. R. Civ. P. 8(f).

## IV. ANALYSIS

### A. Ripeness

The Supreme Court stated the purpose and ef fect of the ripeness doctrine in the context of interfering with an administrative process in Abbott Labs v. Gardner, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515 (1967):

> [T]o prevent the courts, through avoidance of

_____

6. We are not deprived of jurisdiction by reason of the dismissal having been without prejudice. See Black Horse Lane Assoc., L.P. v. Dow Chem. Corp., 228 F.3d 275, 282–87 (3d Cir . 2000).

7. A challenge to a complaint for failure to allege subject matter jurisdiction is known as a "facial" challenge, and must not be confused with a "factual" challenge contending that the court in fact lacks subject matter jurisdiction, no matter what the complaint alleges, as factual challenges are subject to different standards. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977); 5A Wright & Miller, Federal Practice & Procedure S 1350, at 212–18 (West 1990).

11

premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

In some circumstances the ripeness requirement is drawn from Article III limitations on judicial power and in others from prudential limitations. See Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 733 n.7, 117 S.Ct 1659, 1664 n.7 (1997); see also Ridge, 150 F.3d at 323 n.3 (noting ambiguity over whether ripeness is a prudential limitation on federal jurisdiction or is required by the case-or-controversy requirement of Article III of United States Constitution); Travelers Ins. Co. v. Obusek, 72 F.3d 1148, 1154 (3d Cir. 1995) (same); Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 411 n.12 (3d Cir. 1992) (same). Ripeness is a matter of degree whose threshold is notoriously hard to pinpoint. See, e.g., Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512 (1941) ("The difference between an abstract question and a `controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test. . . ."); McCahill v. Borough of Fox Chapel, 438 F.2d 213, 215 (3d Cir. 1971) ("The considerations, while catholic, are not concrete."); Step-Saver Data Sys., Inc. v. Wyse Tech., 912 F.2d 643, 646 (3d Cir. 1990) ("it is difficult to define the contours of the ripeness doctrine with precision") (footnote omitted)).

The Supreme Court in Abbott Labs laid out two fundamental considerations for determination of a ripeness question: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration."[8] 387 U.S. at 149, 87 S.Ct. at 1515. In the

_____

8. Factors relevant to the "fitness" consideration include, but are not limited to, whether the issue is purely legal (as against factual), the degree to which the challenged action is final, whether the claim involves uncertain and contingent events that may not occur as anticipated or at all, the extent to which further factual development would aid decision, and whether the parties to the action are sufficiently adverse. The "hardship" consideration focuses on whether a plaintiff faces a direct and immediate dilemma, such that lack of review will put it to costly choices. See Ridge, 150 F.3d at 323.

context of declaratory judgments, we generally analyze ripeness under the threefold rubric of Step-Saver, 912 F.2d at 647, as did the district court here: first, the adversity of the parties' interests; second, the probable conclusiveness of a judgment; third, the practical utility to the parties of rendering a judgment.9 See Pic-A-State Pa, Inc. v. Reno, 76 F.3d 1294, 1298 (3d Cir. 1996).

1. Adversity

NE Hub claims that the state permit pr ocess with respect to the 30 Issues is preempted but that E.H.B. nevertheless will continue with that process unless enjoined. In these circumstances, NE Hub's and E.H.B.'s inter ests hardly could be more adverse.

Nevertheless, the district court held NE Hub's inter ests insufficiently adverse to E.H.B.'s because:

> In order to demonstrate that its claims ar e ripe, NE

_____

9. The Step-Saver rubric is a distillation of the factors most relevant to the Abbott Labs considerations. See Ridge, 150 F.3d at 323 n.4. Adversity and conclusiveness apparently ar e subsumed under the "fitness" prong of the Abbott Labs  test, while utility is relevant both to
"fitness" and "hardship." Our cases have fit the factors relevant in the Abbott Labs framework into the Step-Saver  headings, as follows:

ADVERSITY:

– Whether the claim involves uncertain and contingent events, or presents a real and substantial threat of harm. See, e.g.,Presbytery of N.J. v. Florio, 40 F.3d 1454, 1466 (3d Cir. 1994).

CONCLUSIVENESS:

– Whether issues are purely legal (as against factual).

– Whether further factual development would be useful.

See, e.g., id. at 1468; T ravelers Ins. Co., 72 F.3d at 1155.

UTILITY:

– Hardship to the parties of withholding decision.

– Whether the claim involves uncertain and contingent events.

See, e.g., Travelers Ins. Co. , 72 F.3d at 1155-56.

Of course, there may be other factors consider ed in a ripeness analysis.

13

Hub must show that the probability of the EHB Defendants acting adversely to NE Hub is real and substantial . . . . [T]he Environmental Hearing Board Defendants have not, as yet, taken any action or issued any decision potentially conflicting with the 7(c) certificate. Further, it is entirely possible that the Environmental Hearing Board will uphold the issuance of the permits by [Pa.D.E.P.] and will never issue any decision conflicting with the federal regulatory scheme.

See NE Hub, slip op. at 15-16.10  This analysis, which focuses on the possible ultimate result of the state regulatory process, does not take into account the case law that preemption may operate to spare a party from that very process. In fact, the process itself may give rise to adversity so that an action challenging the pr ocess is ripe even before the process concludes. Thus, in Freehold Cogeneration Associates, L.P. v. Boar d of Regulatory Commissioners, 44 F.3d 1178 (3d Cir . 1995), we held that a preemption challenge to ongoing proceedings before the New Jersey Board of Regulatory Commissioners invading FERC's domain was ripe even though "the plaintif f did not challenge the ultimate substantive decision, but rather its authority to conduct proceedings":

> [T]he issue here is ripe for adjudication. The proceedings before the [state agency] have been ongoing for nearly one year. The inter est that Freehold seeks to vindicate in this proceeding is the right to be free from `state laws . . . respecting the rates . . . of electric utilities' and from the expense, delay, and uncertainty inherent in the administration of such laws. If, as Freehold insists, the ongoing[state agency]

---

10. The district court also said NE Hub's claim was "based on the `possibility' that state regulatory officials might enter an order that would interfere with the regulatory scheme. Pl. Mem. Supp. Prelim. Inj. at 19. That `possibility' constitutes a contingency only, and is insufficient to constitute adversity of interests." See NE Hub, slip op. at 16. That statement mischaracterizes NE Hub's position which was that the process itself, at least as it related to the 30 Issues, interfered with the regulatory scheme. See, e.g. NE Hub's Br. in Opp'n to the E.H.B. Defendants' Mot. to Dismiss at app. at 749-51; NE Hub's Br. in Opp'n to James M. Seif 's Mot. to Dismiss at app. at 731, 734.

14

proceedings constitute state regulation of utility rates and the burdens on Freehold occasioned by those proceedings are the kinds of burdens which Congress intended [certain facilities] to be spar ed, Congress' mandate would be frustrated if Freehold's right to judicial review were postponed. Ther e is a concrete dispute that has already worked a sever e hardship upon Freehold, and a determination of the legal issue of preemption need not await any further developments . . . .

Id. at 1189.

In Sayles Hydro Associates v. Maughan, 985 F.2d 451, 453–54, 456 (9th Cir. 1993), a Califor nia state water board withheld a hydroelectric plant permit because the applicant did not supply certain reports and studies. The court held that a claim that the Federal Power Act preempted the ongoing state permitting process by occupying the field of power projects regulation was ripe, explaining as follows:

The hardship is the process itself. Pr ocess costs money. If a federal licensee must spend years attempting to satisfy an elaborate, shifting array of state procedural requirements, then he must borrow a fortune to pay lawyers, economists, accountants, archaeologists, historians, engineers, r ecreational consultants, biologists, and others, with no r evenue, no near-term prospect of revenue, and no certainty that there ever will be revenue. Meanwhile, politics, laws, interest rates, construction costs, and costs of alternatives change. Undue process may impose cost and uncertainty sufficient to thwart the federal determination that a power project should proceed.

Id. at 454. Similarly the court in Middle South Energy, Inc. v. Arkansas Public Service Commission, 772 F .2d 404 (8th Cir. 1985), found ripe a claim based on pr eemption and the Commerce Clause against ongoing Arkansas state agency proceedings determining whether to void certain interstate power purchase contracts claimed to be within FERC's sole jurisdiction. The plaintiff successfully

challenge[d] not the state's ultimate substantive decision but its authority even to conduct the

15

> contemplated proceeding. It can hardly be doubted that a controversy sufficiently concrete for judicial review exists when the proceeding sought to be enjoined is already in progress.

Id. at 410-11.

Courts have found insufficient adversity for ripeness where the chance of the defendant acting against plaintiff is but a "contingency." See, e.g. , Presbytery of N.J. v. Florio, 40 F.3d 1454, 1464-68, 1470 (3d Cir. 1994) (insufficient adversity where state said it would not enfor ce challenged law against plaintiff); Armstrong World Indus., 961 F.2d at 413-14 (insufficient adversity between state and plaintiffs challenging validity of takeover law, because takeover of plaintiffs was "contingency which may not occur," in which case they would not suffer from law). Her e, however, there is little doubt that E.H.B. will continue with the permit review process, and that the process itself is the alleged harm.

We recognize that E.H.B. in its pr oceedings has not yet taken a position on whether it will reconsider the 30 Issues, and if so in what depth. Thus, arguably its interest is not substantively adverse to that of NE Hub. See Step-Saver, 912 F.2d at 648. Nevertheless, inasmuch as the process creates the adversity and E.H.B. has not disclaimed a right to reexamine the issues we hold that its inter est is adverse to that of NE Hub. See Supplemental letter brief of E.H.B. at 4, Sept. 13, 2000 ("Because of the structur e and nature of its adjudicatory function, it is not possible for the EHB to determine what issues will be brought to its attention by CNGT and Penn Fuels in their challenge to NE Hub's permits."). At oral argument befor e us E.H.B. adhered to that position.

2. Conclusiveness

Conclusiveness is a short-hand term for whether a declaratory judgment definitively would decide the parties' rights. See Step-Saver, 912 F.2d at 648. It also addresses the extent to which further factual development of the case would facilitate decision, so as to avoid issuing advisory opinions, or whether the question presented is predominantly legal. See Travelers Ins. Co., 72 F.3d at

16

1155. In this case, a declaratory judgment would establish that E.H.B. may or may not review and base its permit decision on a consideration of the 30 Issues, a conclusive result.

Furthermore, additional factual development is unnecessary. We need not await the result of the E.H.B. process to ascertain whether a judgment will be conclusive because NE Hub's contention is that the process itself is preempted as to the 30 Issues regar dless of what the outcome of a proceeding before the E.H.B. would be as to those issues. Moreover, a determination of whether there is preemption primarily raises a legal issue, a circumstance which facilitates entry of a declaratory judgment. See Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720-21 (1983) ("The question of pre-emption is pr edominantly legal, and although it would be useful to have the benefit of [the state's interpretation and application of its r egulations], resolution of the pre-emption issue need not await that development."); Travelers Ins. Co., 72 F.3d at 1155 (preemption is predominantly legal question conducive to declaratory judgment); Freehold Cogeneration Assocs., 44 F.3d at 1188 (judgment would be conclusive because, inter alia, factual developments at ongoing state pr oceedings would not add to construction of allegedly pr eemptive federal statute); cf. Abbott Labs, 387 U.S. at 149, 87 S.Ct. at 1515 (issue ripe for decision because, inter alia, it is "a purely legal one").

The district court held that a judgment would be inconclusive because

> without knowing whether Commonwealth will ultimately deny project authority and on what ground, it is impossible to determine whether its r equirements burden or delay the NE Hub Project to such an extent so as to be preempted by the 7(c) certificate.

See NE Hub, slip op. at 16. Again, this statement overlooks that the state regulatory process itself can be the preempted burden. See discussion, infra, in part IV B of Freehold Cogeneration Assocs., Sayles Hydro Assocs., and Middle South; see also National Fuel Gas Supply Corp. v.

17

Public Service Comm'n, 894 F.2d 571, 578 (2d Cir. 1990) (finding state regulations of gas lines pr eempted for inconsistency with FERC permits because "[e]ven if a [gas] transporter were successful before the[state commission], the practical effect would be to under mine the F.E.R.C. approval by imposing the costs and delays inher ent in litigation that must be undertaken without any guidelines as to the limits on the exercise of state authority"); cf. Pacific Gas & Elec. Co., 461 U.S. at 201–02, 103 S.Ct. at 1721 (preemption claim against moratorium on new nuclear power plants ripe because "to requir e the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable har dship on the utilities, and may ultimately work har m on the citizens of California").

3. Practical Utility

Practical utility goes to "whether the parties' plans of actions are likely to be affected by a declaratory judgment," Step–Saver, 912 F.2d at 649 n.9, and considers the hardship to the parties of withholding judgment. See Freehold Cogeneration Assocs., 44 F .3d at 1189 (discussing hardship to preemption plaintiff of delay under utility prong of Step–Saver). A declaratory judgment "must be of some practical help to the parties. The Declaratory Judgments Act was enacted to clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future." Travelers Ins. Co., 72 F.3d at 1155 (quotation and citation omitted).

A holding that the state proceedings ar e preempted obviously would be useful to NE Hub, which would be spared the hardships associated with the E.H.B. proceedings. NE Hub alleges that it is being put to considerable delay and expense by these proceedings in connection with the issues already dealt with by FERC.11 See, e.g., app. at 981–82. As we stated above, the

_____

11. This contention is undisputed, and is corr oborated by the statement of counsel for Penn Fuel at oral argument before the district court about the expenditures of his own client: "W e spent certainly in the seven figures, I would imagine, in litigating these permits before the E.H.B." See app. at 957.

18

requirement to go through a bur densome process can
constitute hardship for purposes of ripeness. See, e.g.,
Freehold Cogeneration Assocs., 44 F .3d at 1188–89; Sayles
Hydro Assocs., 985 F.2d at 453–56; National Fuel Gas, 894
F.2d at 578–79; Middle South Ener gy, 772 F.2d at 410–411.
Resolving the preemption question now also will eliminate
the possibility that E.H.B. may overturn the Pa.D.E.P.
permits on allegedly preempted gr ounds. Cf. Pacific Gas &
Elec., 461 U.S. at 201–02, 103 S.Ct. at 1720–21
(uncertainty entailed by existence of state pr ocedures part
of harm cognizable in assessing ripeness of pr eemption
claim); Sayles Hydro Assocs., 985 F .2d at 454 (same); but
see Ridge, 150 F.3d at 323–26 (uncertainty as to way new
procedures for determining pension levels would be applied
insufficient hardship to ripen due pr ocess claim).

The district court found that there was not a hardship
because (1) the E.H.B. proceedings would not necessarily
result in meaningless rehashing of issues, (2) additional
process cannot constitute ripeness hardship, and (3) no
state regulation presently stands in NE Hub's way. See NE
Hub, slip op. at 17–18.

The first proposition is correct but beside the point: there
may be some issues that E.H.B. can consider outside of the
30 Issues. Indeed, NE Hub asks that the proceedings before
the E.H.B. be preempted only to the extent of precluding
review of the 30 Issues. Thus, NE Hub does not suggest
that federal preemption precludes E.H.B. from considering
other issues.12 If the state pr ocess is preempted with
respect to the 30 Issues, then undergoing the E.H.B.
process with respect to those issues is a hardship
cognizable for preemption purposes, and thus for
determining ripeness of NE Hub's preemption claims.

For the second proposition, the district court quoted two
cases:

> [T]he Court has not considered . . . litigation cost-
> saving sufficient by itself to justify review in a case that
> would otherwise be unripe. The ripeness doctrine

_____

12. We understand that NE Hub expects that review of any other issues
will be less burdensome than a review of the 30 Issues.

19

> reflects a judgment that the disadvantages of a
> premature review that may prove too abstract or
> unnecessary ordinarily outweigh the additional costs of
> --even repetitive--post-implementation litigation.

Ohio Forestry Ass'n, Inc. v. Sierra Club , 118 S.Ct. 1665,
1671 (1998).

> [T]he burden of participating in further administrative
> and judicial proceedings . . . do[es] not constitute
> sufficient hardship for the purposes of ripeness.

Florida Power & Light Co. v. EPA, 145 F.3d 1414, 1421
(D.C. Cir. 1998). See NE Hub, slip op. at 17. But neither
case involved a claim of preemption. When such a claim
has been advanced, the need to participate in a state
regulatory process in conflict with federal policy has been
recognized as a hardship. See, e.g., Freehold Cogeneration
Assocs., 44 F.3d at 1188-89; Sayles Hydro Assocs., 985
F.2d at 453-56; National Fuel Gas, 894 F.2d at 578-79;
Middle South Energy, 772 F.2d at 410-11; cf. First Iowa
Hydro-Electric Coop. v. Federal Power Comm'n , 328 U.S
152, 66 S.Ct. 906 (1946) (hydroelectric plant project subject
to jurisdiction of Federal Power Commission (FERC's
predecessor) need not obtain permit fr om Iowa, despite law
apparently conditioning federal license on compliance with
state laws). Thus, while the district court's quotations are
accurate they are not controlling pr ecedent in the
circumstances here.

Moreover, the extra litigation or administrative burden at
issue in the cases quoted by the district court was
apparently the burden of filing the same lawsuit later, not
of undergoing an expensive and time-consuming state
process. The cases quoted by the district court involved
challenges to a Plan issued by the United States For est
Service and a rule allegedly issued by the Envir onmental
Protection Agency, respectively. See Sierra Club, 118 S.Ct.
at 1668; Florida Power & Light, 145 F .3d at 1416. In both
cases, how and even whether the Plan and rule would be
applied was unclear; in Florida Power & Light , the court
held the EPA had not even issued a rule. See Florida Power
& Light, 145 F.3d at 1418-19. In Sierra Club, the Court
stated that requiring a challenger to a rule to engage in

20

post-implementation litigation over the rule does not constitute sufficient hardship to ripen "a case that would otherwise be unripe." Sierra Club, 118 S.Ct. at 1671. Clearly, that holding is hardly controlling when the plaintiff 's challenge is to the conduct of an administrative process that imposes an ongoing burden.

The district court's third proposition also misses the point that process can constitute hardship. While it is true that the Pa.D.E.P. permits are valid pending the E.H.B. outcome, it is not a regulation but the r egulatory process that afflicts NE Hub. If the process is pr eempted it is quite immaterial that the effectiveness of the per mits challenged has not been stayed. Moreover, if NE Hub goes forward construction of the Facility while the E.H.B. pr oceedings are pending it may find itself in a difficult situation if Penn Fuel and CNGT are successful before E.H.B.

B. State regulatory process is susceptible of preemption by conflict or by field occupation.

E.H.B. contends that the cases holding a state r egulatory process preempted have involved only field occupation preemption, and should be so confined and thus preemption principles are not applicable here as, in E.H.B.'s view, the NGA and FERC have not occupied the field. See E.H.B.'s br. at 17-23. The district court agreed that this case does not involve field occupation. We, however, strongly doubt that the district court was correct in this conclusion. See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 295 n.1., 300-05, 108 S.Ct. 1145, 1148 n.1, 1150-53 (1988); Sayles Hydro Assocs., 985 F.2d at 453; Pennsylvania Med. Soc'y v. Marconis, 942 F .2d 842, 847 (3d Cir. 1991); Public Utils. Comm'n v. FERC , 900 F.3d 269, 274 (D.C. Cir. 1990). Nevertheless, we need not characterize definitively the type of preemption implicated here to determine ripeness, which is the only issue before us. To the extent the district court already tacitly has decided what type of preemption is involved, on r emand, if it reaches the issue, it should reconsider its decision.13

_____

13. The correct result here with r espect to preemption may be that we are dealing with a hybrid situation in which basically there is field

21

We realize that there would be a r easonable basis for a holding that process preemption should be applicable only when field preemption is implicated. The foundation for the holding would be that unless it is very clear that any result of a state permitting process either will be invalid or redundant a court should not stop the state fr om considering issues that in the absence of pr eemption would be within state jurisdiction and instead should trust in the judgment of the state officials not to inter fere unduly with a federal program.

_____

occupation but FERC, by requiring NE Hub to comply with state drilling regulations and indicating that regulation of underground storage safety is at the state level but providing that state and local authorities should not prohibit or unreasonably delay the construction or operation of the Facility, effectively has converted the case into a conflict preemption matter. In this regard we point out that even within an occupied field federal regulations may tolerate or authorize some exercises of state authority. See First Iowa, 328 U.S. at 167, 66 S.Ct. at 913; cf. National Fuel Gas, 894 F.2d at 579 (noting that though field of interstate gas facility regulation was occupied, FERC could choose to require licensees to obtain state permits).

It is unclear why Judge Nygaard perceives himself as disagreeing with us on this point, for he believes (a) that field preemption applies here, but also (b) "FERC properly exercised its congressionally delegated authority by requiring compliance with state permitting procedures," dissent at 28, and (c) he acknowledges the Certificate's requirement that the results of those permitting pr ocedures "must be consistent with the conditions [thereof]." Thus, FERC has entire control over the occupied field (field occupation), but has allowed the state a regulatory role that it may exercise only insofar as it does not conflict with FERC's decisions (conflict preemption), which is precisely the hybrid sort of preemption by which the dissent purports to be "especially tr oubl[ed]." Id. at 28.

Judge Nygaard also assigns to us a position that we nowhere take, namely, that the E.H.B. appeals conflict with federal law only because they "conflict with congressional intent to legislate exclusively." Dissent at 34 (emphasis in original). Quite the contrary, we recognize the possibility that Congress delegated authority to FERC, and that FERC, in turn has delegated some regulatory authority to the state, which the state may exercise only insofar as it does not conflict with the decisions already made by FERC. Thus, federal rules would not be exclusive because they would not be the only ones the NE Hub must obey, but some state regulations might still conflict with the federal regulations.

22

Nevertheless, the process preemption cases do not confine themselves to the field occupation context, nor would such a limitation be wise. Even where afield has not been occupied to the exclusion of state regulation, certain state regulatory acts clearly would conflict with federal law, and it is as logical to preempt state pr ocess concerning such matters as state actions in occupied fields. 14 Indeed, even if this is a conflict preemption case, it would be quite remarkable to hold that there cannot be pr ocess preemption here inasmuch as Secretary Seif on behalf of Pa.D.E.P. in settling the case recognized that, to the extent that FERC exercised jurisdiction, Pa.D.E.P . "[d]oes not have jurisdiction to consider and cannot conduct final appealable decisionmaking." App. at 855. This r ecognition broadly extended to "all construction activities related to the [Facility], including the drilling and construction of the brining facilities and the technical, safety, and environmental issues which were raised before and considered by FERC." App. at 846. While this stipulation may not be binding on the appellees, inasmuch as the state administrator himself recognizes the pr eemptive effect of the NGA and FERC's exercise of jurisdiction, we have good reason to recognize that conflict pr eemption principles might bar E.H.B. from upholding Penn Fuel's and CNGT's appeal on the 30 Issues.

We also point out that, as the Supreme Court recently has emphasized, the different categories of preemption are not

_____

14. Again, it is unclear why Judge Nygaar d perceives himself as disagreeing with us on this point for he "can possibly envision conflict preemption barring an on-going legal pr oceeding . . . in which the outcome sought by the party opposing preemption is almost certain to conflict with federal law." Dissent at 35. That is exactly what we hold. He
then says that that is not the case here, because the E.H.B. might "impose additional requirements on NE Hub that do not conflict with the 7(c) certificate." Id. That is unquestionably true but irrelevant because NE Hub does not seek preemption of the entir e state process, only of the process with respect to the 30 Issues. W e do not decide whether the outcome of the E.H.B. proceedings with r espect to the 30 Issues would clearly so conflict. That is for the district court to decide on remand.

23

rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.

English v. General Elec. Co., 496 U.S. 72, 79 n.5, 110 S.Ct. 2270, 2275 n.5 (1990); see also Crosby v. National Foreign Trade Council, 120 S.Ct. 2288, 2294 n.6 (2000); Gade, 505 U.S. at 98, 104 n.2, 112 S.Ct. at 2383, 2386 n.2 (1992) (plurality opinion) ("Our ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole." (Emphasis added.)); Sayles Hydro Assocs. , 985 F.2d at 456 ("The dichotomy between the two types of pr eemption [conflict and field] is not so sharp in practical terms as the legal categorization makes it appear . . . .").

A comparison of the standards for identifying these two types of preemption15 shows the reason for the blurring.16 Conflict preemption exists where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. See e.g., Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404 (1941). An occupied field is one in which the federal r egulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152 (1947). That inference is reasonable where any state regulation of the "occupied" subject matter would interfere with the purposes and objectives of the federal plan: a very similar standard to that for conflict preemption. See, e.g., Ray v. Atlantic Richfield Co., 435 U.S. 151, 168, 98 S.Ct. 988, 999 (1978) (finding field preemption of vessel regulations because "a state law in this area . . . would frustrate the Congressional desir e . . .").

_____

15. We are not concerned here with express preemption which is another type of preemption.

16. Contrary to the dissent's suggestion, at 31, by no means do we obliterate the distinction between the types of pr eemption, and we recognize the continuing existence of each. W e simply note that an instance of preemption need not necessarily be pigeonholed into one category or another for purposes of analyzing ripeness.

24

We therefore hold that state r egulatory process may be preempted by conflict with federal law,17 as well as by field occupation. Moreover, we reiterate that we are quite unable to understand why, regardless of the type of preemption asserted, that a claim that a state administrative process is preempted necessarily cannot be ripe when the alleged preemption is of the process itself rather than the possible outcome of the process. We also note that it would be entirely logical in an appropriate case to hold that the process is not preempted but to hold later that the result of the process is preempted.

Furthermore, if it is evident that the r esult of a process must lead to conflict preemption, it would defy logic to hold that the process itself cannot be preempted and that a complaint seeking that result would not raise a ripe issue. Thus, in view of the substantial showing her e that E.H.B. by upholding Penn Fuel's and CNGT's position on the 30 Issues might well reach a result that would be preempted, the process preemption claim is ripe. Of course, we hasten to add that we do not state a conclusion on whether the process actually is preempted here for, as even NE Hub recognizes, the district court should make that decision on the remand. See Presbytery of N.J. , 40 F.3d at 1470.18

C. The need for FERC rehearing

Finally we reject the district court's and appellees' view that NE Hub by bringing this action was circumventing

_____

17. Federal law includes federal regulations, which have no less preemptive effect than federal statutes. See e.g., Capital Cities Cable, Inc.
v. Crisp, 467 U.S. 691, 699, 104 S.Ct. 2694, 2700 (1984).

18. Our opinion should not be overread. W e are not holding that any claim of process preemption necessarily is ripe so that the court should consider the preemption claim before the process is completed. It well may be that in a particular case when conflict pr eemption is implicated the court may conclude that it reasonably can be anticipated that the process will yield a result that is not pr eempted. But in this case we have an unusual situation in which the state administrator has stipulated the agency's jurisdiction effectively has been preempted, a result which, though not binding on the appellees, if accepted would mean that a successful administrative appeal would lead to a preempted outcome.

FERC's rehearing process. In the first place, the district court reached that conclusion on the erroneous theory that NE Hub was contending "that Pennsylvania lacks authority to subject the NE Hub Project to any regulation whatsoever." NE Hub, slip op. at 18. In fact, NE Hub does not challenge FERC's requirement that it obtain state permits and cooperate with state and local agencies. Indeed, it has done these things. It simply contends that the E.H.B. state proceedings are preempted but only to the extent that they involve the 30 Issues considered by FERC. We see nothing in the Certificate or the NGA that precludes NE Hub's preemption argument and it therefore follows that in making that argument NE Hub is not challenging the terms of the Certificate. Furthermore, we do not believe that a requirement that a party obtain applicable state permits and cooperate with state and local agencies in any way determines the scope of what issues a state administrative agency may consider on an appeal from the issuance of the permits.19

V. CONCLUSION

For the foregoing reasons we will reverse the order of April 7, 2000, dismissing this action and will remand the case to the district court to reinstate this action. On the remand the district court should consider the preemption argument on the merits unless it upholds another defense to this action.

_____

19. The dissent characterizes NE Hub's claim as a challenge to the terms of the Certificate because the E.H.B. proceeding is one "that FERC implicitly sanctioned." Dissent at 40. But the dissent does not explain where in the Certificate FERC "implicitly sanctioned" a state proceeding insofar as it deals with measures already disposed of by FERC.

Judge Nygaard states that he and we "disagree over who should determine whether the state actions at issue were `consistent' with FERC's certificate. The Majority believes that FERC delegated that authority to the federal courts. I believe that FERC maintained its discretion." Dissent 32 n.5. Federal agencies do not "delegate" authority to decide federal constitutional and legal questions to courts; as noted above, at 37, federal court jurisdiction over such matters comes from Congress. We are aware of no authority granting FERC a right of first refusal to decide such questions, nor does Judge Nygaard proffer any.

NYGAARD, Circuit Judge, dissenting :

I would affirm the District Court's disposition of N.E. Hub's field preemption claim. Therefor e, I dissent. Central to the Majority's holding is its assertion that"we need not characterize definitively the type of preemption implicated here." Majority at 21. I believe that characterizing N.E. Hub's claim is the first and most important issue in this case. By failing to resolve it, the Majority ignores binding Supreme Court precedent and unnecessarily complicates a well-settled area of law. Especially tr oubling are its proposal of a new class of "hybrid" pr eemption, and its reference to a mysterious "process" preemption.

Congress intended to occupy the field of law at issue. Therefore, the disputed appeals ar e subject to federal field preemption. Nonetheless, I would affir m the District Court's decision, because FERC properly exercised its congressionally delegated authority by r equiring compliance with state permitting procedures. More importantly, even if FERC overstepped its bounds, the proper course for N.E. Hub would have been to challenge FERC directly under the guidelines established by federal statute. Because N.E. Hub failed to do so, I agree with the District Court that we lack jurisdiction to consider the current claim.

I.

A brief review of the law of preemption is instructive. Assuming it has the constitutional power to legislate in a given area, Congress can preempt state law whenever it intends federal law to control. See Fr eehold Cogeneration Assocs., L.P. v. Board of Regulatory Comm'rs of State of New Jersey, 44 F.3d 1178, 1190 (3d Cir . 1995) ("[T]he application of the preemption doctrine r equires a determination of congressional intent in enacting a federal law."). The key inquiry is congressional intent, which can either be explicit or implied. When it is implied, intent can take one of two forms. First, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 621 (1984). Congr essional intent to occupy a field can be inferred fr om:

a `scheme of federal regulation so pervasive as to make reasonable the inference that Congr ess left no room to supplement it,' `because the Act of Congr ess may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because `the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.'

Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722 (1983). Second, if Congress has not occupied an entire field, "state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law." Id.

In sum, there are three circumstances under which federal law preempts state law: (1) when Congr ess, through explicit statutory language, defines an ar ea in which federal law controls, (2) when Congress implicitly indicates an intent to occupy a given field to the exclusion of state law, and (3) when federal law actually conflicts with state law. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 2617 (1992); Buzzard v. Roadrunner Trucking, Inc., 966 F.2d 777, 780 (3d Cir. 1992). We have consistently analyzed preemption claims according to this framework. See Abdullah v. American Airlines, 181 F .3d 363, 367 (3d Cir. 1999).

II.

Next, I turn to N.E. Hub's specific claim. In Schneidewind v. ANR Pipeline Co., the Supreme Court held that Congress intended to occupy the field at issue.1  See 485 U.S. 293, 308, 108 S.Ct. 1145, 1155 (1988) ("[T]he control of rates and facilities of natural gas companies . . . ar e precisely the things over which FERC has comprehensive authority."). The Court noted that it "is now well settled[that] Congress
_____

1. Because Congress failed to describe explicitly the extent to which the NGA preempts state regulation of natural gas facilities, the first of the aforementioned circumstances (expr ess preemption) does not apply.

28

occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commer ce." Id. at 305, 108 S.Ct. at 1153. An overwhelming amount of authority supports this assertion.2 Even in Maritimes & Northeast Pipeline, L.L.C., No. CP97-238-001, 1997 WL 812154, at *8 (F.E.R.C. Nov. 4, 1997), the case most heavily relied upon by CNGT and Penn Fuel, FERC noted that "the NGA preempts State and local agencies fr om regulating the construction and operation of interstate pipeline facilities." It is simply beyond peradventure that Congr ess intended the NGA to occupy the field of law at issue.

Both the Majority and the District Court disagr ee and hold that field preemption does not apply. The District Court expressly rejected field pr eemption, but nonetheless addressed and rejected the claim on its merits. The Majority purports to avoid categorizing the claim, but still implicitly endorses conflict preemption. I believe that field preemption does apply, but I agree with the District Court that the claim fails on its merits. This is an important question. If field preemption applies but FERC validly exercised its authority, we should affir m the District Court's decision and not remand the case. Fundamentally, the resolution of this question -- whetherfield preemption applies -- controls whether this case is r emanded or affirmed. I therefore review the opinions of the Majority and District Court in turn.

_____

2. See e.g., Interstate Natural Gas Co. v. Federal Power Comm'n, 331 U.S. 682, 690, 67 S.Ct. 1482, 1487 (1947) ("As was stated in the House Committee Report, the `basic purpose' of Congr ess in passing the Natural Gas Act was "to occupy this field in which the Supreme Court has held that the States may not act."); Pennsylvania Medical Soc'y v. Marconis, 942 F.2d 842, 847 (3d Cir. 1991) ("The field of matters relating to wholesale sales and transport of natural gas in interstate commerce [has] been occupied by federal legislation."); Public Utils. Comm'n of State of California v. FERC, 900 F.2d 269, 274 (D.C. Cir. 1990) ("Cases are legion affirming the exclusive character of FERC jurisdiction where it applies . . . under the NGA."); Algonquin LNG v. Loqa, 79 F.Supp.2d 49, 51 (D.R.I. 2000) ("Congress clearly has manifested an intent to occupy the field.").

A.

The Majority at first seems to agree with me that field preemption should apply. It states that "[t]he district court [held] that this case does not involve field occupation. We, however, strongly doubt that the district court was correct." Majority at 21 (emphasis added). The Majority fails to apply field preemption, however, and instead holds that "we need not characterize definitively the type of pr eemption implicated here to determine ripeness." Majority at 21. In spite of this, I believe that the Majority tacitly does characterize N.E. Hub's claim. It rejects field preemption and endorses conflict preemption, even though its reasoning assumes that Congress has occupied the field.

The District Court's decision requires us to categorize the claim in this case, because it addressed N.E. Hub's two preemption "theories" and reached different outcomes for each. The court held that conflict preemption was not ripe, but rejected field preemption on separate grounds.3 The Majority states that ripeness "is the only issue before us." Majority at 21. The District Court discussed ripeness only in connection to conflict preemption. Ther efore, the Majority's opinion, to the extent that it exclusively focuses on ripeness, holds that only conflict preemption is at issue.

Furthermore, because courts need only address conflict preemption in the absence of field pr eemption, see Silkwood, 464 U.S. at 248, 104 S.Ct. at 621 ("If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law."), the Majority's focus on ripeness tacitly rejects field preemption. If field preemption applied, there would be no reason to analyze the ripeness of the conflict preemption claim.4  In fact, the Majority

_____

3. The District Court explicitly addressed the field preemption claim, "NE Hub's alternative theory, that Pennsylvania lacks authority to subject the NE Hub Project to any regulation whatsoever." MemOp. at 18. The court characterized the claim as a direct "challenge to the express provisions of [FERC's] 7(c) certificate," and found that it lacked jurisdiction because
N.E. Hub should have appealed directly to FERC. MemOp. at 18.
4. The Majority argues that we need not categorize the preemption claim in order to analyze its ripeness. However , the District Court only found ripeness lacking in the conflict preemption claim; therefore, we need not address ripeness unless the claim is one of conflict preemption.

explicitly holds that N.E. Hub never raised a field preemption claim. See Majority at 26. Thus, even though it "strongly doubt[s] that the district court was correct [to reject field preemption]," Majority at 21, the Majority rejects it as well.

Instead, the Majority suggests that we have a "hybrid situation" in which "there is field occupation but FERC . . . has converted the case into a conflict preemption matter." Majority at 21–22 n.13. I disagree with this characterization for two reasons. First, neither law nor logic suggests the existence of such a thing, and second, for r easons I explain more fully in Section II.B., supra, FERC does not have the authority to abdicate its congressionally delegated authority.5 In addition, I fail to see how this "hybrid" differs practically from pure conflict preemption considering that FERC "has converted the case into a conflict pr eemption matter." Majority at 21–22 n.13 (emphasis added). If a "hybrid" preemption claim carries with it a differ ent standard, the Majority does not describe what it might be. For these reasons, I believe that the Majority, in spite of its language to the contrary, tacitly did categorize N.E. Hub's claim as conflict preemption, and the District Court must apply that doctrine upon remand.

The Majority offers two additional arguments to support its position: (1) field and conflict preemption overlap and are difficult to distinguish, and (2) the existence of a legal process can form the basis of a field or conflict preemption

_____

5. The Majority believes that FERC delegated its occupation of the field, at least in part, to the states. Ther efore, any "conflicts" that arose could form the basis of a conflict preemption claim in federal court. The important difference between us is that I believe FERC continued to maintain its ultimate authority. Because it continued to occupy the field, it maintained its discr etion to interpret the terms of its 7(c) certificate. If an alleged "conflict" arose, it was up to FERC to determine if the certificate had been violated. Our review of such a decision would be the same as our r eview of any other action by an administrative agency in an occupied field. In sum, the Majority and I disagree over who should deter mine whether the state actions at issue were "consistent" with FERC's certificate. The Majority believes that FERC delegated that authority to the federal courts. I believe that FERC maintained its discr etion.

31

claim. See Majority at 24-25. When r eviewed carefully, neither support the Majority's holding; in fact, both ironically assume that Congress has pr eempted the field.

First, the Majority argues that it need not characterize N.E. Hub's claim, because field and conflict pr eemption are not "rigidly distinct," see English v. General Elec. Co., 496 U.S. 72, 79 n.5, 110 S.Ct. 2270, 2275 n.5 (1990), 6 implying, based upon its definitions, that field and conflict preemption are indistinguishable. T echnically, all forms of federal preemption can be described as (and meet the definition of) conflict preemption,7 for the simple reason that preemption only occurs when a state action conflicts with congressional intent.8 In spite of its extremely broad definition, however, conflict preemption does not refer to the entire range of all federal preemption. Instead, courts use the term quite narrowly -- it applies when a state regulation conflicts with federal law in a non-occupied field.9 See Silkwood, 464 U.S. at 248, 104 S.Ct. at 621 ("If Congress has not entirely displaced state regulation over the matter in question, state law is still pr eempted to the extent it actually conflicts with federal law.").

_____

6. The Supreme Court footnote from which the Majority derives its argument nonetheless explicitly upheld the thr ee categories of preemption. See English, 496 U.S. at 79 n.5, 110 S.Ct. at 2275 n.5 ("[B]ecause we previously have adverted to the three-category framework, we invoke and apply it here.").

7. According to its broad definition, conflict preemption applies whenever a state regulation "actually conflicts with federal law, that is, when it is
impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." See Silkwood, 464 U.S. at 248, 104 S.Ct. at 621 (citations omitted); see also e.g., English, 496 U.S. at 79, 110 S.Ct. at 2275 (citations omitted).

8. Courts have identified, and labeled, thr ee forms of federal preemption (express, field, and conflict preemption) that vary according to their scope. According to the Supreme Court,"[f]requently, the preemptive `label' we choose will carry with it substantive implications for the scope
of preemption." Gade v. National Solid W aste Mgmt. Ass'n, 505 U.S. 88, 104 n.2, 112 S.Ct. 2374, 2386 n.2 (1992).

9. Conflict preemption in an occupiedfield would be unnecessary and duplicative, because all state regulation is barred by field preemption.

The Majority fails to make this distinction. It compares the definitions of conflict and field preemption and argues that field preemption is simply a presumption of conflict preemption over an entire area of law.10 Because all three categories of federal preemption technically fall within the definition of conflict preemption, any state regulation (or judicial proceeding, as in this case) subject to field preemption would also be barred under the technical definition of conflict preemption. See English, 496 U.S. at 79, 110 S.Ct. at 2275 (defining conflict pr eemption, in part, to apply when "state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' ").

However -- and this is the critical point -- in this case, the only reason that the challenged state actions (the appeals) satisfy the definition of conflict pr eemption is because Congress has preempted thefield. The Majority never asserts that the appeals at issue make it"impossible to comply with both state and federal law," but merely that they frustrate congressional intent to legislate exclusively in this area. In other words, as the Majority phrases it, conflict preemption holds because the state proceedings "interfere with the purposes and objectives of the federal plan." Majority at 24. The "federal plan," I suppose, refers to Congress' intent to occupy the field at issue. Thus, the Majority's argument, when closely scrutinized, goes something like this: (1) Congress preempted the field, and (2) the appeals at issue constitute state action within that field; therefore, (3) the appeals conflict with congressional intent to legislate exclusively. The Majority's r easoning implicitly recognizes that Congress intended to occupy the field at issue. As such, I would affix the pr oper "label" to N.E. Hub's preemption claim. When a state law"conflicts" with "the purposes and objectives" of Congr ess to occupy a given field, courts label it field, notconflict, preemption.11

_____

10. See e.g., English, 496 U.S. at 79 n.5, 110 S.Ct. at 2275 n.5 ("[F]ield preemption may be understood as a species of conflict preemption: A state law that falls within a preempted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.").

11. In a footnote, the Majority claims that "by no means do we mean to obliterate the distinction between the types of pr eemption, and we

The Majority's second argument further underscores its implicit recognition that Congress has pr eempted the field.12 The Majority argues that it need not classify the claim at issue, because either field or conflict pr eemption can bar a legal process such as the appeals in this case.13 See Majority at 23 ("[T]he process pr eemption cases do not confine themselves to the field occupation context."). The Majority cites no case in which any court has held that conflict preemption bars an unfinished legal process with an indeterminate outcome. I too was unable tofind such a case.14

The only scenario in which I can possibly envision conflict preemption barring an on-going legal proceeding is one in which the outcome sought by the party opposing preemption is certain to conflict with federal law. In other words, for conflict preemption to apply, the relief sought by CNGT and Penn Fuel would have to conflict totally with FERC's 7(c) certificate. This is not the case. It is entirely possible that the Environmental Hearing Boar d could, as a result of the appeals at issue, impose additional

_____

recognize the continuing existence of each." Majority at 24 n.16. However, if we need not classify the pr eemption claim in this case, in spite of Supreme Court precedent explicitly holding that Congress has occupied the field, I fail to see how the distinction retains any force.

12. For the remainder of this dissent, I r efer to conflict preemption in the
manner that courts apply it (in a non-occupied field) rather than according to its sweeping definition, which encompasses all forms of federal preemption.

13. I assume that when the Majority uses the ter m "process preemption," it is referring to a federal preemption claim based upon an ongoing legal process. Unlike conflict or field preemption, "process preemption" is not a term of art; in fact, a Westlaw search revealed that no federal court has
ever used the term.

14. The Majority relies upon two unsupported assertions: (1) its own belief that "certain regulatory acts clearly would conflict with federal law,
and it is as logical to preempt state pr ocess concerning such matters as state actions in occupied fields," and (2) a statement by the administrator of the Pennsylvania Department of Environmental Protection that the agency lacked jurisdiction to "conduct final appealability decisionmaking" in this matter . Majority at 23.

requirements on N.E. Hub that would not conflict with the 7(c) certificate.15

In sum, the Majority purports to avoid categorizing N.E. Hub's claim. In reality, however, it r ejects field preemption and requires the District Court to apply conflict preemption upon remand, even though its reasoning assumes that Congress has occupied the field. Accor ding to the Supreme Court, conflict preemption should be applied only if "Congress has not entirely displaced state regulation over the matter in question" explicitly or thr ough implied field preemption. Silkwood, 464 U.S. at 248, 104 S.Ct. at 621. In this case, the overwhelming weight of Supreme Court precedent indicates that Congress intended the NGA to occupy the field at issue. As a result, I disagree with the Majority's approach and would instead applyfield preemption.

B.

The District Court addressed the classification issue explicitly. It held that field preemption does not apply, because FERC had affirmatively limited its own jurisdiction. It noted that "[a]lthough the Natural Gas Act might be read to completely preempt any state regulation of the transport, storage and sale of natural gas in interstate commer ce, FERC has interpreted its jurisdiction under the Natural Gas Act to allow for some state regulation." MemOp. at 13. In effect, the District Court held that FERC r efused to occupy the given field and instead partially delegated its

_____

15. The Majority states that conflict pr eemption bars "the process with respect to the 30 Issues," because its outcome is "almost certain to conflict with federal law." Majority at 23 n.14. In practice, I seriously doubt that a court could effectively isolate state proceedings likely to lead to conflicting outcomes from those that could possibly lead to "additional requirements . . . that donot conflict with the 7(c) certificate."
Majority at 23 n.14. Forcing courts to do so would in effect require them to predict the outcomes of unfinished legal proceedings in separate jurisdictions. I suspect that this difficulty explains why courts have widely refused to apply conflict preemption to bar an ongoing state process, and have instead relied uponfield preemption when it is appropriate.

responsibilities to the states. The Majority seems to endorse this conclusion hesitantly in a footnote, ter ming this case a "hybrid" situation. See Majority at 21 n.13.

The District Court's analysis, and the Majority's r eference to it, is flawed. Admittedly, Chevron v. NRDC, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82 (1984), often r equires courts to defer to an agency's statutory interpr etation, and we have held that Chevron defer ence extends to an agency's interpretation of its own jurisdiction. See Puerto Rico Mar. Shipping Auth. v. Valley Freight Sys., Inc., 856 F.2d 546, 552 (3d Cir. 1988) ("This rule of defer ence is fully applicable to an agency's interpretation of its own jurisdiction."). However, courts need only defer to an agency when the intent of Congress is unclear. See Chevron, 467 U.S. at 842–43, 104 S.Ct. at 2781–82 ("If the intent of Congr ess is clear, that is the end of the matter.").16 Here, as previously discussed, the intent of Congress to occupy the entire field is, and has been for decades, clearly established by the Supreme Court. As a result, FERC could not limit its jurisdiction in the face of contrary, clear congr essional intent. See id. at 843 n.9, 104 S.Ct. at 2781 n.9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

Furthermore, based upon my reading of Maritimes, FERC did not intend to restrict its jurisdiction. See 1997 WL 812154, at *8. Quite the contrary – it exer cised its wide-ranging jurisdiction in order to requir e that natural gas companies comply with state regulations as a condition to granting a 7(c) certificate. After reaffir ming the NGA's preemption of state and local regulation, FERC stated that "as a matter of policy, . . . the Commission has imposed upon applicants a requirement that they cooperate with

_____

16. See also Neal v. United States, 516 U.S. 284, 295, 116 S.Ct. 763, 769 (1996) ("Absent . . . compelling evidence bearing on Congress' original intent, our system demands that we adhere to our prior interpretations of statutes."); Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 131, 110 S.Ct. 2759, 2768 (1990) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of stare decisis, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning.").

State and local authorities." Id. (emphasis added). FERC did not limit its own jurisdiction, but rather used its authority to implement a policy objective. If it had, in fact, abdicated its jurisdiction, it would have been unable to impose state regulations upon anyone.

It is undisputed by both the Majority and the District Court that Congress intended federal law to occupy the entire field at issue. Because neither FERC nor this Court have the discretion to contravene clear congr essional intent, field preemption should apply. The ripeness of N.E. Hub's conflict preemption claim is ther efore irrelevant.

III.

Finally, I address the merits of N.E. Hub'sfield preemption claim. First of all, it is clearly ripe. We require that a claim satisfy three elements in or der to be ripe for decision: "adversity of the interests of the parties, conclusiveness of the judicial judgment and the practical help, or utility, of that judgment." Step–Saver Data Systems, Inc. v. WYSE Technology, 912 F.2d 643, 647 (3d Cir. 1990). All three are satisfied. The state pr oceedings themselves constitute an injury establishing adversity of inter est. See Sayles Hydro Assocs. v. Maughan, 985 F .2d 451, 454 (9th Cir. 1993) (holding that in the field preemption context, "[t]he hardship is the process itself.").17 A decree indicating that FERC's 7(c) certificate preempted all state regulation of N.E. Hub's project would be "conclusive" under any definition of the term, see Step–Saver , 912 F.2d at 648, and it would be "useful," because it would allow N.E. Hub to proceed with its project. See id.

_____

17. See also Freehold, 44 F.3d at 1189 (holding that a field preemption claim was ripe because "the plaintiff did not challenge the state's ultimate substantive decision, but rather its authority to conduct proceedings."); Middle South Ener gy, Inc. v. Arkansas Pub. Serv. Comm'n, 772 F.2d 404, 410–11 (8th Cir. 1985) (claim ripe where the plaintiff "challenges not the state's ultimate substantive decision but its authority
to even conduct the contemplated proceeding. It can hardly be doubted that a controversy sufficiently concr ete for judicial review exists when the proceeding sought to be enjoined is alr eady in progress.").

Apparently, the District Court agreed that if field preemption applied, N.E. Hub's claim was ripe. After a lengthy and unnecessary discussion of the ripeness of the conflict preemption claim, it moved immediately to the merits of the field preemption claim (without discussing its ripeness). The court held that the claim failed on its merits:

> NE Hub's alternative theory, that Pennsylvania lacks authority to subject NE Hub Project to any r egulation whatsoever, must also fail on jurisdictional grounds. Such an attack constitutes a challenge to the expr ess provisions of the 7(c) certificate issued by FERC to NE Hub, which clearly contemplate and even direct NE Hub's compliance with state regulation. As pointed out by Defendants CNGT and Penn Fuel in their motions to dismiss, the Court lacks jurisdiction over such a challenge to the 7(c) certificate, as NE Hub failed to apply to FERC for a rehearing of its April 29, 1998 Order issuing the 7(c) certificate.

MemOp. at 18–19 (citations omitted). I agree with the Court's reasoning and outcome, but it would be helpful to elaborate further. FERC's 7(c) certificate required compliance with state and local regulations. Specifically, it stated that:

> Any state or local permits issued with r espect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities by this Commission.

J.A. at 109. The District Court interpreted this language to require that N.E. Hub obtain "any and all necessary state or local permits required to carry out the drilling and construction program." MemOp. at 5. In addition, the 7(c) certificate also contained a number of mor e specific provisions that required compliance with individual state regulations. See MemOp. at 14–15.

38

FERC's discretion in granting a 7(c) certificate is far-reaching. Section 717f(e) of the NGA pr ovides that, "[t]he Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may requir e." 15 U.S.C. S 717f(e). Under this authority, FERC r equired compliance with state and local regulations as long as they did not "prohibit or unreasonably delay the construction or operation of [the] facilities." J.A. at 109. FERC did not abdicate its jurisdiction; it exercised it.

This interpretation is consistent with FERC's discussion of state regulations in Maritimes, 1997 WL 812154, at *8. In that case, FERC described its "requir ement" that applicants cooperate with state and local authorities as being something it had "imposed" as "a matter of policy." Id. A plain reading suggests that FERC was simply exercising its wide jurisdiction over the field, requiring applicants to comply with state and local regulations that impose additional, non-conflicting measures. W ere an actual conflict to arise, FERC noted that its decisions would control.

FERC could have required, subsequent to its S 717f(e) authority, that applicants comply with conditions identical to those found in state regulations. It is unclear why, and indeed N.E. Hub has failed to argue that, r equiring compliance with state regulations that impose potentially non-conflicting conditions would be outside FERC's authority. Even if it were, as the District Court held, N.E. Hub's proper course would have been to challenge the validity of FERC's 7(c) certificate by seeking a r ehearing within thirty days of its issuance. See 15 U.S.C. S 717r(a). It failed to do so. N.E. Hub cannot now collaterally attack FERC's authority under S 717f(e) by challenging a state appellate process that FERC implicitly sanctioned. See City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 335-36, 78 S.Ct. 1209, 1218-19 (1958); Williams Natural Gas Co. v. City of Oklahoma City, 890 F.2d 255, 262 (10th Cir. 1989) ("[A] challenger may not collaterally attack the validity of a prior FERC order in a subsequent proceeding . . . whether the collateral action is brought in state court or federal court.").

IV.

I would affirm the District Court's decision based upon its disposition of the one legitimate claim at issue – N.E. Hub's argument that the state proceedings at issue are field preempted by FERC's 7(c) certificate. Field preemption does apply, but FERC exercised its wide-ranging authority to require compliance with state regulations. Because N.E. Hub failed to challenge FERC's authority dir ectly, it cannot now challenge the 7(c) certificate in this Court. The District Court properly held that it lacked jurisdiction over the claims at issue, and as a result, N.E. Hub's claims were properly dismissed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit